V. L. (PAT) JONES, PLAINTIFF AND APPELLANT, *v.* HARRY
L. BURNS, L. V. SWANSON, OTIS S. WATERS, S. N.
HALVORSON, AND ROY L. SORRELS, AS MEMBERS OF AND
CONSTITUTING THE MONTANA STATE HIGHWAY COMMISSION,
DEFENDANTS AND RESPONDENTS.

———

THE MONTANA POWER COMPANY, A CORPORATION;
MONTANA-DAKOTA UTILITIES COMPANY, A CORPORA-
TION; PACIFIC POWER AND LIGHT COMPANY, A COR-
PORATION; AND THE MOUNTAIN STATES TELEPHONE
AND TELEGRAPH COMPANY, A CORPORATION,

THREE RIVERS RURAL TELEPHONE CO-OP; MID-
RIVERS TELEPHONE ASSOCIATION; NORTHERN
TELEPHONE ASSOCIATION; TRIANGLE TELEPHONE
ASSOCIATION; NEMONT TELEPHONE ASSOCIATION;
VALLEY TELEPHONE CO-OP; AND BLACKFOOT TELE-
PHONE CO-OP, EACH A CORPORATION,

RAVALLI COUNTY ELECTRIC CO-OPERATIVE, INC.;
SUN RIVER ELECTRIC CO-OPERATIVE, INC.; LOWER
YELLOWSTONE RURAL ELECTRIC ASSOCIATION,
INC.; VIGILANTE ELECTRIC CO-OPERATIVE, INC.;
MISSOULA ELECTRIC CO-OPERATIVE, INC.; FLAT-
HEAD ELECTRIC CO-OPERATIVE, INC.; FERGUS
ELECTRIC CO-OPERATIVE, INC.; PARK ELECTRIC
CO-OPERATIVE, INC.; MID-YELLOWSTONE ELEC-
TRIC CO-OPERATIVE, INC.; BEARTOOTH ELECTRIC
CO-OPERATIVE, INC.; BIG HORN COUNTY ELECTRIC
CO-OPERATIVE, INC.; BIG FLAT ELECTRIC CO-OPER-
ATIVE, INC.; SHERIDAN COUNTY ELECTRIC CO-
OPERATIVE, INC.; NORTHERN ELECTRIC CO-OPER-
ATIVE, INC.; VALLEY COUNTY ELECTRIC CO-OPER-
ATIVE, INC.; McCONE COUNTY ELECTRIC CO-OPER-
ATIVE, INC.; GOLDENWEST ELECTRIC CO-OPER-
ATIVE, INC.; MARIAS RIVER ELECTRIC CO-OPER-
ATIVE, INC.; HILL COUNTY ELECTRIC CO-OPER-

ATIVE, INC.; TONGUE RIVER ELECTRIC CO-OPER-
ATIVE, INC.; SOUTHEAST ELECTRIC CO-OPER-
ATIVE, INC.; AND LINCOLN ELECTRIC CO-OPER-
ATIVE, INC., INTERVENORS AND RESPONDENTS.

No. 10086.

Submitted June 15, 1960. Decided November 16, 1960.

357 P. 2d 22.

Loble & Picotte and Patrick F. Hooks, Helena, for plaintiff and appellant. Patrick F. Hooks argued orally.

Forrest H. Anderson, Atty. Gen., and Paul T. Keller, Clayton R. Herron, Donald Douglas, Mark P. Sullivan, Philip Strope and David Dean, Sp. Asst. Attys. Gen., for defendants and respondents.

Weir, Gough & Booth, Helena, William H. Coldiron and Sam B. Chase, Jr., Butte, for intervenor Montana Power Co.

Murphy, Robinson & Keller, Kalispell, Coleman, Lamey & Crowley, Billings, for intervenors Pacific Power & Light and Montana-Dakota Utilities Co.

Toomey & Hughes, Helena, Akolt, Turnquist, Shepherd, Dick & Rovira, Denver, for intervenor Mt. States Tel. & Tel. Co.

Graybill, Bradford & Graybill and P. J. Gilfeather, Great Falls, for intervenors Telephone and Electric Co-ops.

MR. CHIEF JUSTICE HARRISON delivered the Opinion of the Court.

272

This is an appeal from a judgment of the district court of the first judicial district, Lewis and Clark County, holding section 32-1625, R.C.M. 1947, to be constitutional in an action brought by plaintiff under the Uniform Declaratory Judgments Act against the defendants, who comprise the Montana Highway Commission, seeking a declaration of the rights of the parties particularly as to the obligation of the defendants under section 32-1625, R.C.M. 1947, to reimburse private and cooperatively owned utilities, for relocating their facilities upon public, highways, and challenging the constitutionality of the above section.

Following the filing of the complaint, applications were made for leave to intervene by various utility companies. Such applications were filed by one privately owned power and light corporation, two privately owned electric and gas corporations and one privately owned telephone and telegraph corporation. The operations of these utilities are practically state-wide. Seven cooperatively owned telephone companies with headquarters at Fairfield, Circle, Shelby, Havre, Scobey, Glasgow and Missoula likewise applied for leave to intervene. Twenty-three cooperatively owned electric companies with headquarters at Corvallis, Fairfield, Sidney, Huntley, Dillon, Missoula, Kalispell, Lewistown, Livingston, Hysham, Red Lodge, Lodge Grass, Malta, Medicine Lake, Opheim, Glasgow, Circle, Wibaux, Shelby, Havre, Ashland, Ekalaka and Eureka, also petitioned for leave to intervene. All requests for leave to intervene were granted and the respondents in this cause were the Montana Highway Commission, four privately owned and thirty cooperatively owned public utility companies.

Plaintiff's specifications of error present the single issue of law, to-wit; the constitutionality of section 32-1625. He contends that the district court erred in holding that section to be constitutional and declares that it violates Mont. Const., Art. XII, § 1b; Art. XIII, § 1; Art. III, § 11; Art. V, § 29; Art. V. § 39; and U.S. Const., Art. I, § 10; and 30 U.S.C.A., § 191.

Initially, plaintiff asserts that if section 32-1625, R.C.M. 1947, is held to be constitutional there will be a substantial diminution of highway funds in the State of Montana and that the utility companies of this state, whether privately, publicly or cooperatively owned, will be given a "free ride." A cursory reading of this section and the Federal Highway Act of 1956, 70 Stat. 383, § 111 (1956); 23 U.S.C.A. § 162, (now 23 U.S.C.A. § 123), will point out the fallacy in plaintiff's assertion.

Section 32-1625, R.C.M. 1947, enacted as Chapter 254, Session Laws of Montana, 1957, provides:

"(a) The state highway commission shall have the power and authority to make and publish after appropriate hearings reasonable regulations for the installation, construction, maintenance, repair, renewal and relocation of tracks, pipes, mains, conduits, cables, wires, towers, poles and other equipment and appliances (herein called 'facilities') of any utility in, on, along, over, across, through or under any project on (1) the Federal-Aid Primary System, or (2) the Federal-Aid Secondary System, or on (3) the Interstate System, including extensions thereof within urban areas. Whenever the commission shall determine, after written notice supplied to all concerned not less than twenty (20) days in advance of hearing and fair, public hearing at the time and place noticed for hearing (unless hearing is waived by the utility or other interested parties in writing), that it is necessary that any such facilities which now are, or hereafter may be, located in, on, along, over, across, through or under any such Federal-Aid Primary System, Federal-Aid Secondary System, or on the Interstate System, including extensions thereof within urban areas, should be relocated, the utility owning or operating such facilities shall relocate the same in accordance with the valid order of the commission, and seventy-five per cent (75%) of all costs of relocation, including acquisition of new right of way, dismantling, and removal, shall be paid by the state of Montana through the state highway commission. In case of any such relocation of

facilities, as aforesaid, the public utility owning or operating the same, its successors or assigns, may maintain and operate such facilities, with the necessary appurtenances, in the new location or new locations.

"(b) Definitions. For the purposes of this section:

"The term 'utility' shall include publicly, privately and co-operatively owned utilities.

"The term 'cost of relocation' shall include the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility; and,

"The term 'Interstate System' means any highway now included or which shall hereafter be included as a part of the National System of Interstate and Defense Highways, as provided in the Federal-Aid Highway Act of 1956, and any acts supplemental thereto or amendatory thereof.

"(c) The cost of relocating utility facilities in connection with any project on the Federal-Aid Primary System or Federal-Aid Secondary System or on the Interstate System is hereby declared to be a cost of highway construction."

First, the act does not relate to relocation of facilities on all highway projects carried on within the state, but only to the relocation of facilities on the Federal-Aid Primary, Federal-Aid Secondary, and Interstate Systems. Under 23 U.S.C.A. § 162, the State of Montana will be reimbursed substantially by the Federal Government for all monies paid by the state to utility companies which are ordered to relocate their facilities in connection with such projects. The reimbursement will be in the same proportion that the Federal Government is contributing to the other costs on the project. On the Federal-Aid Primary and Secondary Systems this is 56.54 per cent, and on the Interstate System it is 65.23 per cent or 91.31 per cent, depending on which years appropriations are being used on the project.

U.S.Code Cong. & Ad. News, Vol. II, 85th Cong., 2d Sess., p. 2374 (1958).

Second, the state will have to pay utilities for relocation costs incurred in connection with the above-named projects only when the State Highway Commission, after a public hearing, shall determine that it is necessary for certain facilities to be relocated. If the utility companies take it upon themselves to move their facilities without having been ordered to do so by the commission, they will not be entitled to any reimbursement from the state. The propriety of ordering any relocation of facilities rests entirely within the State Highway Commission's discretion, and whether money will be spent on relocation of utility facilities will depend upon their decision.

Third, the utility companies of this state will not receive any substantial benefit by such act, but will merely be protected against any undue and extreme loss which might otherwise be occasioned by the "crash program of unprecedented scale" which was promulgated in the Federal-Aid Highway Act of 1956.

When the Federal-Aid Highway Act of 1958 was under consideration, Senate Report No. 1407 of the Committee on Public Works, recommended an amendment to section 111 of the Federal-Aid Highway Act of 1956 to provide for reimbursement only when a state under state laws was required to pay for all or any part of such cost, limited to 70 percent of the cost which the state was obligated to pay.

In opposing the report of the committee certain members of the Senate expressed their views in these words:

"It is submitted that there was valid reason for the States to amend their laws. The conditions under which utilities agreed to bear the burden of relocation costs disappeared, or at the very least were radically and substantially changed, with the enactment of Federal-Aid Highway Act of 1956.

"In the old days, such relocation costs were encountered on a gradual and small scale. They embraced relatively minor op-

erations in type. Their sum total was within the reach of the utilities' ability to fund same, whether the utility was publicly, privately, or cooperatively owned.

"Under the act of 1956 all of this was heavily changed. A crash program of unprecedented scale was inaugurated. Federal funds available for highway construction rocketed from $875,-000 to $2 billion within a single year. Greater increases are scheduled for following years. In addition, the type of construction changed. The modern, multilane, high speed traffic ways require rights-of-way of spectacular width; cloverleafs, overpasses, and underpasses; and long distances thereof through urban areas, bringing expressways to the heart of metropolitan centers.

"These changes brought about inordinate expenditures for moving vast amounts of facilities at a great cost to the users of the utilities. They bring about a tremendously different treatment than when highway improvement was a local convenience and local cost, relatively speaking.

"Under the old order there was not only a smaller cost but also a greater identity between the users of the utilities affected, and the taxpayer who provided funds for the highway improvement which resulted.

"A special unfairness which results from these costs is attributable to the Interstate Highway System. Some communities and some utilities will pay the entire load. Most of the communities and utilities, many located just a short distance away, will not pay any of the load, and yet they will benefit almost as fully from the construction of the Interstate System. * * *

"Should an Interstate Highway run to the heart of a small utility (it might be an REA, a co-op phone company, or electrical distribution system, or what have you), or through or near a small city or village, it is conceivable that fiscal ruin could be visited upon them." 2 U.S.Code Cong. & Ad. News, 85th Cong., 2d Sess., pp. 2397-2398 (1958).

Fourth, section 32-1625 does not provide for complete reim-

bursement to the utility companies for all moneys spent by them in relocating their facilities, but only to the extent of 75 per cent of the non-betterment costs. This is expressly provided for in the statute (section 32-1625) where it states that the cost of relocation is "the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility." In other words, the utility company will be reimbursed only to the extent of 75 per cent of the net loss suffered by the company in relocating its facilities, and will suffer a net loss to the extent of 25 per cent of the non-betterment costs of relocation.

Plaintiff also insists that to hold section 32-1625 constitutional would result in changing a bare permissive use of public roads by utilities into a valuable vested property right. The right of the intervening telephone and telegraph companies to maintain their poles and lines within this state has a constitutional basis. Mont.Const., Art. XV, § 14. The legislative assembly of Montana in implementing the provisions of this mandate enacted what is now section 70-301, R.C.M. 1947. This section provides:

"A telegraph, telephone, electric light, or electric power line, corporation, or public body or any other person owning or operating such, is hereby authorized to install its respective plants and appliances necessary for service, and to supply and distribute electricity for lighting, heating, power, and other purposes, and to that end to construct such telegraph, telephone, electric light or electric power line or power lines, from point to point, along and upon any of the public roads, streets, and highways in the state of Montana, by the erection of necessary fixtures, including posts, piers, and abutments necessary for the wires. But the same shall be so constructed as not to incommode or endanger the public in the use of said roads, streets, or highways, and nothing herein shall be so construed as to restrict the powers of city or town councils."

It should be noted that when the legislative assembly enacted

this section it recognized that there was equal reason to give utility companies transmitting electrical light and power the right to maintain their facilities in the public ways in Montana as there was to give such rights to telephone and telegraph companies.

That states have the power to encourage the running of telephone, telegraph, and power lines across the country by providing the utility companies a place in the public roads, to locate these lines cannot be doubted. See 29 C.J.S., Electricity, § 16, p. 525; 52 Am.Jur., Telegraphs and Telephones, § 28, et seq., p. 57. This encouragement was especially necessary here in the west where the states in their fight for economic development were faced with the problem of small population and large unpopulated areas.

Under the common law, the right the utility companies acquired by the state's permission to locate facilities in the public ways was not an absolute property right. The state in the exercise of its police power could require the utility companies to relocate their facilities and this would not be a taking of property in the constitutional sense. New Orleans Gas Light Co. v. Drainage Comm., 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831. However, it has been pointed out time and time again that a state could abrogate its common law in this respect and provide for reimbursement to utility companies when they are required to remove their facilities from public ways by an exercise of the state's police power. Opinion of Justices, 152 Me. 449, 132 A.2d 440; Delaware River, etc. v. Pennsylvania Pub. Utility Comm., 393 Pa. 639, 145 A.2d 172; Baltimore Gas & Electric Co. v. State Roads Comm., 214 Md. 266, 134 A.2d 312; Lehigh Valley R. Co. v. Canal Board, 204 N.Y. 471, 97 N.E. 964; Westchester E. R. Co. v. Westchester County P. Comm., 255 N.Y. 297, 174 N.E. 660; Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N.W.2d 642; State v. City of Dallas, Tex. 1960, 331 S.W.2d 737; Northwestern Bell Telephone Co. v. Wentz, N.D. 1960, 103 N.W.2d 245; State Road Comm. v. Utah

Power & Light Co., 1960, 10 Utah 2d 333, 353 P.2d 171. By changing the common law the state does not necessarily give the utility companies a vested property right to place their facilities in the public ways which they never had before; it merely recognizes an equitable and just right in the utility companies to be protected against any loss they might suffer in the event they are required to remove their facilities from the public ways by an exercise of the state's police power.

In Oswego & Syracuse R. Co. v. State, 226 N.Y. 351, 124 N.E. 8, the Court of Appeals of New York was concerned with the problem whether the state or the railway company should bear the cost of rebuilding a railroad bridge which would be destroyed by the construction of a barge canal pursuant to the Barge Canal Act. The court recognized the fact that the state had no legal duty to pay for the cost of reconstructing the bridge and might have required the railroad to rebuild the bridge at its own expense, but said that the Barge Canal Act provided that new bridges were to be built at the expense of the state. In holding that it was proper for the state to recognize claims which have their roots in equity and justice, Mr. Justice Cardozo, speaking for the court stated:

"The state was about to execute a great public work. It saw that in the doing of that work there would be destruction of private property. Much of the damage would be *damnum absque injuria*. None the less is would be damage. The result would be inequality in the distribution of public burdens. Some would pay more dearly than others in proportion to benefits received. This inequality, the Legislature, fixing in advance the conditions of the undertaking, had the power to correct. It might refuse to launch an enterprise at the price of hardship and oppression. There was power to destroy, and leave the loss where it might fall. There was also power to pay for the destruction, and thereby re-establish some uniformity of proportion between benefits and burdens. The question was for the Legislature whether the equity of compensation was strong enough to merit recog-

280

nition. We cannot hold it to be illusory.'' Oswego & Syracuse R. Co. v. State, supra, 226 N.Y. at page 357, 124 N.E. at page 10.

This court has also recognized the principle that even though the state is under no legal duty to compensate a particular loss, the legislature might assume liability for an equitable and just claim. There is no common-law duty for the sovereign to reimburse individuals for losses occasioned by tortious acts of the sovereign's agents. In Mills v. Stewart, 76 Mont. 429, at page 440, 247 P. 332, at page 335, 47 A.L.R. 424, this court recognized that the state could abrogate this common-law lack of duty wherein it stated, that "since it is not prohibited by the state Constitution or by the supreme law of the land to assume liability for the torts of the state's agents, it may do so.''

The same equitable considerations which existed in the Oswego case so as to justify the state's paying for the cost of reconstructing the railroad's bridge are present in the instant case. In that case, neither the railroad, its passengers, nor its stockholders would receive any benefit as a result of the destruction of its old bridge and the construction of a new one in the same location providing more clearance over the river. The old bridge which the state required the railroad company to destroy was only seven years old. The purpose of raising the bridge was to permit the state to increase navigation facilities on the river thereby creating a competitor to the railroad and benefiting the public in general.

In the instant case, neither the utilities, their users, their stockholders nor cooperatively owned utilities or their members, will receive any direct and substantial benefit from relocation of the utilities' facilities. It cannot be contended that the relocation will make the service to the users any better, or reduce their rates, or provide any more income for the company. The purpose behind requiring relocation of existing facilities is to provide the traveling public with wider, straighter, and better highways. It is only equitable that the state should place the

burden of relocating existing utility facilities on those who will derive the benefit therefrom.

If it is determined that section 32-1625 was intended to abrogate the common-law duty of the utilities to pay for the relocation of their facilities when such relocation was required by the State Highway Commission in connection with any project in the Federal-Aid Primary, Federal-Aid Secondary, or Interstate Systems and to recognize their equitable and just claim for reimbursement, then the intervenors' right to reimbursement would not depend on whether they had a vested property right to locate their facilities in the public ways in Montana and it would be unnecessary in disposing of this case to determine the exact nature and extent of that right.

During the period 1952-1956, Committees of Congress held numerous and extensive hearings on the question of reimbursement of utilities for costs incurred in relocating facilities when such relocation was made necessary by the construction of new Federal-Aid highways. As a result of these hearings, and recognizing that the relocation of such facilities was a necessary part of new highway construction, Congress in 1956 specifically authorized the use of Federal funds to reimburse states for amounts paid to utilities for the non-betterment cost of relocating such facilities by enacting the Federal Highway Act of 1956. 70 Stat. 383, § 111; 23 U.S.C.A. § 162, which provides as follows:

"(a) Availability of Federal Funds for Reimbursement to States.—Subject to the conditions contained in this section, whenever a State shall pay for the cost of relocation of utility facilities necessitated by the construction of a project on the Federal-aid primary or secondary systems or on the Interstate System, including extensions thereof within urban areas, Federal funds may be used to reimburse the State for such cost in the same proportion as Federal funds are expended on the project: *Provided,* That Federal funds shall not be apportioned to the States under this section when the payment to the utility violates

the law of the State or violates a legal contract between the utility and the State.

"(b) Utility Defined.—For the purposes of this section, the term 'utility' shall include publicly, privately, and cooperatively owned utilities.

"(c) Cost of Relocation Defined.—For the purposes of this section, the term 'cost of relocation' shall include the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility."

Prior to the enactment of that act, it had been the practice of the Bureau of Public Roads to reimburse states for the amounts paid by them for the relocation of utility facilities located on highways being constructed with Federal aid. 2 U.S. Code Cong. & Ad. News, 85th Cong., 2d Sess., p. 2396 (1958). Many states at this time were not paying for such relocations, but were following the common law whereby utilities, who placed their facilities on public ways by reason of a permissive right granted by the state, had to pay the cost of relocating such facilities in the event relocation was made necessary by the state exercising its police power. In enacting 23 U.S.C.A. § 162, it was the intention of Congress to grant reimbursement to states only where they were lawfully paying the utility companies for the cost of relocating their facilities. This is evidenced by the statement that "Federal funds shall not be apportioned to the States under this section when the payment to the utility violates the law of the State or violates a legal contract between the utility and the State." As a result of this declaration, many states which had previously been following the common law, or whose law on the subject was uncertain, passed laws which were designed to erase all doubt and ensure the state's ability to receive the Federal Aid authorized by 23 U.S.C.A. § 162.

Referring again to Senate Report No. 1407 of the Committee on Public Works, we find this summary:

"Since the enactment of the Federal-Aid Highway Act of 1956, which increased the Federal share of the cost of constructing the Interstate System to 90 percent, and up to 95 percent in some public land States, and expressly authorized the use of Federal-aid funds for reimbursement of the cost of relocating utility facilities, significant action has been taken in many State legislatures. During 1956 and 1957, legislation which would provide for payment by the State of the cost of relocating public-utility facilities was considered by the legislative assemblies in 40 States. Such legislation was passed in 22 States, but was vetoed in 6 States, so it became law in 16 States. Under these 16 State laws only 1 State will pay the cost of relocating utility facilities on all State-maintained highways, 5 relate to all Federal-aid projects, and 10 relate to the projects on the Interstate System only, where the Federal share of the cost is at least 90 percent." 2 U.S.Code Cong. & Ad.News, 85th Cong., 2d Sess., p. 2383 (1958).

Montana is one of the 16 states listed in which such legislation became law. Section 32-1625 was passed by the legislative assembly of Montana so as to remove any doubt about this state's right to receive the benefit of the Federal aid authorized by 23 U.S.C.A. § 162.

Mont.Const., Art. III, § 1b, hereafter referred to as the anti-diversion amendment, provides in part:

"No monies paid into the state treasury which are derived from fees, excises or license taxes relating to registration, operation or use of vehicles on the public highways or to fuels used for the propulsion of such vehicles, * * * shall be expended for other than cost of administering laws under which such monies are derived, statutory refunds and adjustments provided therein, payment of highway obligations, cost of construction, reconstruction, maintenance and repair of public highways, roads, streets, and bridges. * * *"

This section was enacted as Chapter 239, Laws of 1955, approved by the people at the general election of November 6, 1956, and became effective by governor's proclamation, December 28, 1956.

Plaintiff's contention is that the cost of relocating utility facilities made necessary by highway construction is inherently not part of the ''cost of construction'', and that the legislative assembly of Montana could not by declaration make something a cost of construction which is inherently not such a cost. If this were true, it would be a violation of Mont.Const., Art. XII, § 1b, to use monies derived from the sources named therein to pay utilities for relocating their facilities, and therefore, section 32-1625 would be unconstitutional and void.

The question whether costs incurred in relocating utility facilities can be properly considered as part of the cost of constructing highways has been considered by many authorities, including Congress. It was the opinion of Congress in enacting 23 U.S.C.A. § 162, that the conditions which existed and flourished while the common law on this subject was being formulated had changed, and that relocation costs necessitated by Federal-aid highway construction should be considered as a part of the cost of constructing these highways and borne by the state rather than the utility companies. 2 U.S.Code Cong. & Ad. News, 85th Cong., 2d Sess., pp. 2396-2397 (1958).

Many legislatures by their enactments have expressly found that relocation expenses are an integral part of the cost of highway construction. See Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N.W.2d 642, 650, note 10.

The highest courts of five states, Utah, Texas, North Dakota, New Hampshire, and Minnesota, have expressly declared that the cost of relocating utility facilities in connection with a highway improvement program can be properly considered as a part of the cost of constructing the highway. State Road Comm. v. Utah Power & Light Co., 1960, 10 Utah 2d 333, 353 P.2d 171; State v. City of Dallas, Tex.1960, 331 S.W.2d 737; Northwestern

Bell Telephone Co. v. Wentz, N.D.1960, 103 N.W.2d 245; Opinion of the Justices, 101 N.H. 527, 132 A.2d 613; Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N.W.2d 642, supra.

Nine states, Idaho, Maine, Minnesota, New Hampshire, New Mexico, North Dakota, Tennessee, Texas, and Utah have passed upon the constitutionality of statutes similar to section 32-1625 providing for reimbursement to utilities for costs incurred in relocating their facilities in connection with Federal-aid highway projects. State ex rel. Rich v. Idaho Power Co., 1959, 81 Idaho 487, 346 P.2d 596; Opinion of the Justices, 152 Me. 449, 132 A.2d 440, supra; Minneapolis Gas Co. v. Zimmerman, supra; Opinion of the Justices, 101 N.H. 527, 132 A.2d 613, supra; State Highway Comm. v. Southern Union Gas Co., 65 N.M. 84, 332 P.2d 1007; Northwestern Bell Telephone Co. v. Wentz, N.D. 1960, 103 N.W.2d 245; State v. Southern Bell Telephone & Telegraph Co., Tenn.1958, 319 S.W.2d 90; State v. City of Dallas, Tex.1960, 331 S.W.2d 737; State Road Comm. v. Utah Power & Light Co., 1960, 10 Utah 2d 333, 353 P.2d 171.

Idaho, Maine, Minnesota, New Hampshire, North Dakota and Texas were the only states where it was claimed that the legislation under consideration violated a prohibition similar to that contained in our antidiversion amendment. The latter four states specifically held that such a prohibition was not violated by legislation which provided for payment of relocation costs to the utility companies out of state highway funds where the legislature had specifically declared that relocation costs were to be considered as part of the cost of constructing the highway.

The North Dakota court in the Northwestern Bell Telephone case [103 N.W.2d 256] first pointed out that their constitutional provision, which is similar to Montana's antidiversion amendment, "does not define or restrict the meaning of 'construction' in any way", and then stated, "We believe it embraces 'everything appropriately connected with, and necessarily incidental to, to complete accomplishment of the general purpose for which

the fund exists.' See 40 C.J.S. Highways § 176, h. (2) (a)."
This is a recognition that it would be unreasonable to give such
constitutional prohibitions the narrow construction advanced by
the plaintiff in the instant case.

Montana's antidiversion amendment does not define the
words "construction, reconstruction, maintenance and repair
of public highways, roads, streets, and bridges", and to give
these words the narrow interpretation contended for by the
plaintiff would seriously curtail and limit the Highway Com-
mission in its activities. For example, if the relocation of utility
facilities is declared not to be a "cost of construction" within
the meaning of the antidiversion amendment, the Highway
Commission could not spend highway funds covered by that
amendment to relocate facilities located on fee rights-of-way.
Since many utility facilities in Montana are located on utility
owned rights-of-way, and since in an area where they must be
moved in order to build new Federal highways, admittedly the
state would have to reimburse the utility, it would be necessary
for the Highway Commission to secure funds from sources
other than those mentioned in the antidiversion amendment.
This would seriously delay any major highway project.

The courts of Idaho and Maine held that statutes similar to
section 32-1625 resulted in the use of highway funds for a non-
highway purpose and were therefore violative of constitutional
provisions similar to our antidiversion amendment. Strong dis-
sents in both states pointed out the fact that the majority had
given the word "construction" an unreasonably narrow inter-
pretation. In his dissent in Opinion of the Justices, 152 Me.
449, 132 A.2d 440, 444, supra, Justice Webber stated, "I am
satisfied that the limitation placed upon the expenditure of
highway funds was designed and intended to prevent raids on
those funds for purposes entirely unrelated to the highway
program. In my view expenditures which may reasonably be
considered as incidental to the construction or reconstruction of
highways may properly be met out of highway funds whenever

the Legislature elects. * * * If it were found less costly to move a building and establish it in a new location than to purchase the building outright and demolish it, I would not think that the expenditure of highway funds for this purpose would violate the constitutional intent.'' If the cost of relocating buildings, fences, and road-crossings can be considered as part of the cost of constructing the highway, why not the cost of relocating utility facilities? The difference is only in degree and not in principle. In view of the fact that these states have chosen to place a narrow interpretation on the word ''construction'' their decisions are not controlling on this court.

There is further reason why this court should not follow the decision of the Idaho court, but rather the decision of the Minnesota court. This is based on the fact that Idaho has a different policy than Montana or Minnesota on what is to be regarded as a primary and proper use for which highways are designed.

In Minneapolis Gas Co. v. Zimmerman, supra, 253 Minn. 164, 91 N.W.2d 642, 649, the Minnesota court, after quoting the following from Cater v. Northwestern Tel. Exch. Co., 60 Minn. 539, 63 N.W. 111, 112, 28 L.R.A. 310:

'' '* * * the public easement in a highway is not limited to travel or transportation of persons or property in movable vehicles. * * * But it is now universally conceded that urban highways may be used for constructing sewers and laying pipes for the transmission of gas, water, and the like for public use. * * * The uses referred to of urban streets are not in aid of travel, but are themselves independent and primary uses, although all within the general purpose for which highways are designed. Neither can a distinction between urban and rural ways be sustained * * *'', stated at page 649 of 91 N.W.2d:

''Clearly since the Cater decision in 1895, Minnesota has been definitely committed to the view that the use of rights-of-way by utilities for locating their facilities is one of the proper and primary purposes for which highways are designed even though

their principal use is for travel and the transportation of persons and property."

Such use of streets and highways is conducive to the public welfare and serves one of the purposes for which they are dedicated.

In Hershfield v. Rocky Mt. B. T. Co., 12 Mont. 102, at page 118, 29 P. 883, at page 887, this court also committed itself to this view when it stated "We think that to use the street in a reasonable manner, and to a reasonable extent, for this purpose [placing telephone poles and lines along the streets] is just and proper, and is within the uses to which the street may lawfully be put, when such use is sanctioned by the public through its duly-authorized municipal agents."

In State ex rel. Rich v. Idaho Power Company, 81 Idaho 487, 346 P.2d 596, the Idaho court expressly held that it was not committed to this view.

Plaintiff's claim that the legislative assembly of Montana could not expressly declare that costs of relocation are to be a cost of highway construction is unsound. He seems to be under the impression that the "cost of relocating utility facilities" does not fall within the plain and ordinary meaning of "cost of construction" and that the legislative definition of words should not extend beyond the plain and ordinary meaning given to them. However, as pointed out in Montana Beer R. P. Ass'n v. State Bd. of Equalization, 95 Mont. 30, at page 34, 25 P.2d 128, at page 130: "In construing a statute, ordinarily, the words employed must be given their usual meaning, unless it is made apparent from the context of the subject that a different one was intended. * * * Here it is manifest from the context of the act under consideration that the above terms were not used in their usual and ordinary sense and, therefore, this court in construing the statute is bound to follow the legislative definitions contained in the act, even though they are contrary to the usual and ordinary meaning of the words."

The legislative assembly of Montana has expressly declared that the definition of "cost of highway construction" is to include "cost of relocating utility facilities."

This is a reasonable definition, one adopted by the Congress of the United States and approved by the majority of courts of last resort in states where the matter has arisen, and therefore this court will not interfere.

We hold therefore, that section 32-1625 does not violate Mont. Const., Art. XII, § 1b.

We now come to plaintiff's second constitutional objection, to-wit: that section 32-1625 violates Mont. Const., Art. XIII, § 1, because its purpose is to aid private and cooperatively owned utilities in the conduct of their business for profit.

Mont. Const., Art. XIII, § 1, provides:

"Neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or a joint owner with any person, company or corporation, except as to such ownership as may accrue to the state by operation or provision of law."

We have heretofore pointed out that no direct or substantial benefit will accrue to the utilities and thus at the outset it appears that this constitutional challenge is not well-taken. However, since plaintiff has raised the question we will touch upon it.

Various states, other than those nine wherein relocation statutes similar to section 32-1625 were considered, have been confronted with the problem whether use of public funds to relocate utility facilities violates a constitutional prohibition preventing the state, its counties, cities, or other subdivisions from giving or loaning its credit in aid of, or making any donation or grant to any individual, association, or corporation. The cases are in conflict, some holding the constitutional provi-

sion is violated, and some holding it is not.

Seven of the nine states which considered the constitutionality of relocation statutes similar to section 32-1625 were confronted with the question whether such legislation violated a constitutional provision similar to Mont. Const., Art. XIII, § 1. The courts of Utah, Texas, North Dakota, and Minnesota held such legislation was not violative of such a constitutional provision. The courts of Idaho, New Mexico, and Tennessee held that it was.

This court has been called upon many times to determine the meaning of Article XIII, § 1, supra; therefore, it is not necessary to examine the opinions of other state courts in detail in order to determine whether section 32-1625 violates that constitutional provision.

In Willett v. State Board of Examiners, 112 Mont. 317, 115 P.2d 287, a leading case involving Article XIII, § 1, supra, the question presented was whether state tax monies could be expended to construct a building which would benefit certain private organizations without violating that constitutional provision. In upholding the constitutionality of the statute, this court stated, 112 Mont. on page 322, 115 P.2d on page 289: "The test to be adopted in determining whether a donation or grant is prohibited under this section is whether the donation or grant is for a public purpose. * * * What is a 'public purpose' is a question primarily for legislative determination, with which we will not interfere unless there has been a clear abuse of power. * * * That the project here is for a public purpose there can be no reasonable doubt; at least we cannot say that the legislature abused its power in so determining. The fact that the named organizations incidentally derive special benefit from the project does not bring the Act in conflict with section 1, Article XIII."

This quotation points out three propositions which are of primary significance in determining whether legislation is violative of Mont. Const., Art. XIII, § 1. They are: (1) The test

for determining the validity of a donation or grant is whether it is for a public purpose; (2) The question what is a public purpose is primarily for the legislature; and, (3) The fact that individuals, associations, or corporations derive special benefit from the legislation does not necessarily affect its validity.

Propositions (1) and (3) have been reiterated repeatedly in a long line of cases considering the constitutionality of legislation under Article XIII, § 1, supra; State ex rel. Cryderman v. Wienrich, 54 Mont. 390, 170 P. 942; State ex rel. Campbell v. Stewart, 54 Mont. 504, 171 P. 755; Mills v. Stewart, 76 Mont. 429, 247 P. 332, 47 A.L.R. 424; Stanley v. Jeffries, 86 Mont. 114, 284 P. 134, 70 A.L.R. 166; Willett v. State Board of Examiners, 112 Mont. 317, 115 P. 2d 287; State ex rel. Graham v. Board of Examiners, 125 Mont. 419, 239 P.2d 283.

It cannot be questioned that legislation providing for the construction of public highways serves a public purpose; therefore, expenditures for the cost of constructing such highways are not violative of Article XIII, § 1, supra, even though the recipients are individuals, associations, or corporations.

Also, where it becomes reasonably necessary to relocate utility facilities in order to improve the highway for public travel, an expenditure of funds to effect such relocation is properly a governmental function exercised for a public purpose of primary benefit to the entire community.

Plaintiff, in contending that the legislation under consideration violates Article XIII, § 1, supra, relies heavily on a statement appearing in Cramer v. Montana State Board of Food Distributors, 113 Mont. 450, 129 P.2d 96, which tends to indicate that the nature and capacity of the recipient is determinative of whether an expenditure by the state violates Article XIII, § 1, supra. In that opinion, 113 Mont. at page 453, 129 P.2d at page 97, it is stated: "Upon an examination of the language of the provision we find that the restriction is not to the use to which monies may be put, but to the nature or capa-

city of the recipient. It specifies 'individual, association or corporation.' "

This statement is not correct, and insofar as the Cramer case indicates that the nature and capacity of the recipient of state monies is determinative of whether Article XIII, § 1, supra, has been violated, it is hereby expressly overruled.

■ The expenditures authorized by section 32-1625 are for a public purpose, and therefore that section is not violative of Article XIII, § 1, of the Montana Constitution.

Next, plaintiff maintains that section 32-1625 impairs the obligation of a contract in violation of Mont. Const., Art. III, § 11, and the United States Const., Art. 1, § 10.

Plaintiff contends that certain permits issued by the State Highway Commission to the Montana Power Company authorizing it to run natural gas pipes under certain highways at four specific places creates contractual obligations which will be impaired by section 32-1625 and that a contract to which the state is a party is as much within the constitutional prohibition of statutes impairing the obligation of contracts as a contract between individuals.

Even if the permits could be construed as imposing upon the utilities a contractual obligation to relocate at their own expense, there is nothing in the contract clause of the Montana or United States Constitutions which prevents abrogation of a contract by the contracting parties. Minneapolis Gas Co. v. Zimmerman, supra, 253 Minn. 164, 91 N.W.2d 642, 656.

■ The constitutional prohibition of statutes impairing the obligation of contracts prevents a state from unilaterally abrogating contracts which it has entered into, but it does not affect the validity of statutes releasing obligations due the state. City of Worcester v. Worcester Consol. Street Ry. Co., 196 U.S. 539, 25 S.Ct. 327, 49 L.Ed. 591.

Plaintiff's next contention is that section 32-1625 violates Mont. Const., Art. V, § 29, by allowing extra compensation to the utility after a contract has been made and that the remis-

sion of a contractual obligation constitutes extra legal compensation.

Montana Constitution, Art. V, § 29, provides:

"No bill shall be passed giving any extra compensation to any public officer, servant or employee, agent or contractor, after services shall have been rendered or contract made, nor providing for the payment of any claim made against the state without previous authority of law, except as may be otherwise provided herein."

At the outset it should be noted that this provision of the Constitution contains two prohibitions. It prohibits extra compensation after services shall have been rendered or contract made, and it prohibits the payment of any claims without previous authority of law.

This court in Mills v. Stewart, supra, 76 Mont. 429, 247 P. 332, 47 A.L.R. 424, made a clear, succinct and concise statement of what this constitutional provision means and how it should be applied. The court at page 437 of 76 Mont., at page 334 of 247 P. said:

"The meaning of the first portion of the section is perfectly clear: It is beyond the power of the legislature to award extra compensation for the services of any officer, agent, servant, or employee of the state after the services have been performed (Lloyd v. Silver Bow County, 11 Mont. 408, 28 P. 453), or, after a contract has been awarded, to allow extra compensation to the contractor for the work contemplated by his contract. The declaration that the Legislature shall not provide for the payment of any claim made against the state without previous authority of law was apparently intended to prevent the recognition and discharge of claims arising from *ultra vires* acts of officers or agents of the state. It refers exclusively to claims arising out of contract, and has no application here. This is the history of like provisions found in other state Constitutions."

From the foregoing analysis by the court, it is clear that

the type of contract for which extra compensation is prohibited is one which has been awarded for work to be performed by a party for the state. The intervenors have not contracted with the state to perform any work for it. Intervenors' facilities have been placed in the public ways pursuant to legislative permission granted in section 70-301, R.C.M.1947. The permits previously mentioned were given in compliance with the legislative directive found in that section. Nothing contained in the permits creates any contract whereby the intervenors are to perform any work for the state.

Section 32-1625, R.C.M.1947, does not violate Art. V, § 29, Montana Constitution.

, Plaintiff also contends that section 32-1625 is in violation of Art. V, § 39, Mont. Const., which reads, in part, as follows:

"Except as hereinafter provided, no obligation or liability of any person, association or corporation, held or owned by the state, or any municipal corporation therein, shall ever be exchanged, transferred, remitted, released or postponed, or in any way diminished by the legislative assembly; nor shall such liability or obligation be extinguished, except by the payment thereof into the proper treasury."

Implicit in the argument is the proposition that the common-law duty of the utility companies to relocate their facilities at their own expense constitutes an obligation or liability within the meaning of Article V, § 39, supra.

Constitutional provisions similar to article V, § 39, of the Montana Constitution, have been held to apply only to fixed and liquidated claims owed to the state, its counties, or its municipal corporations. Roberts v. Fiscal Court, 244 Ky. 596, 51 S.W.2d 897; Cole v. Burton, 313 Ky. 557, 232 S.W.2d 838, 15 A.L.R.2d 1356; State Revenue Agent v. Fragiacomo, 71 Miss. 417, 15 So. 798.

It cannot be reasonably or logically contended that there was created any fixed or certain money obligation owed by the utility companies to the state. The common-law duty of the utility

companies arose only when and if the existing facilities interfered with the rearrangement of a highway; it was only a contingent obligation to change the location of their facilities.

Furthermore, the language of the constitutional provision itself tends to indicate that it was meant to apply only to fixed and liquidated claims owed to the state, its counties, or its municipal corporations.

The first part of the constitutional provision states that no obligation or liability shall be released, remitted or postponed, and then the second part of the provision states that: " * * * nor shall such liability or obligation be extinguished, except by the payment thereof into the proper treasury.''

It is apparent that the ''nor'' clause refers to the same obligation or liability discussed at the beginning of the section. It thus becomes apparent that the section as a whole applies only to such obligations or liabilities which are capable of being ''extinguished'' by payment into the proper treasury. This points directly to a liability or obligation which has been reduced and liquidated into a definite money account.

There is no violation of Mont. Const., Art. V, § 39.

Plaintiff's challenge that section 32-1625, R.C.M.1947, violates 30 U.S.C.A. § 191, comes to naught. This point involves only the question whether the relocation expenses involved herein are part of the ''costs of construction and maintenance of public roads.'' That question has already been decided in this opinion.

For the foregoing reasons, the judgment of the lower court is affirmed.

MR. JUSTICES ANGSTMAN and CASTLES concur.

MR. JUSTICE BOTTOMLY dissenting.

I cannot agree with the majority opinion in this serious and far-reaching matter.

The question before us here is whether or not Chapter 254,

Laws of 1957, is constitutional. If it is, then the State of Montana, through its State Highway Commission, will be compelled and forced to take from the state highway fund millions of dollars of such fund and pay the same to any private, public or cooperatively owned utility, when it becomes necessary in the process of building highways to relocate the pipes, mains, conduits, cables, wires, towers, poles and other equipment and appliances of such utilities. This obligation is forced upon the State even though the utilities to be relocated have been given only a permissive right under our law to install their lines and facilities along the present highways of this state. Under Chapter 254, supra, 75 percent of all costs of relocating must be paid to the utility affected out of the highway trust fund by the State Highway Commission, and in addition the State must pay 75 percent of the cost of furnishing said utilities a new firm right-of-way. Such is the interpretation of the majority opinion herein. Yet it should be remembered that a hard-fought constitutional provision (section 1b, Art. XII, Mont. Const.) was adopted by the people of this State at the general election on *November 6, 1956,* and approved by the Governor's proclamation on *December 28, 1956,* wherein and whereby the people themselves wanted it understood and determined that *"No monies paid into the state treasury which are derived from fees, excises, license taxes relating to registration, operation or use of vehicles on the public highway or to fuels used for the propulsion of such vehicles * * * shall be expended for other than cost of administering laws under which such monies are derived, statutory refunds and adjustments provided therein, payment of highway obligations, cost of construction, reconstruction, maintenance and repair of public highways, roads, streets, and bridges, and expenses authorized by the state legislature for dissemination of public information relating to the public highways, roads, streets and bridges of the state of Montana".* Emphasis supplied.

However, in the face of this mandate of the people, the Leg-

islature, as soon as possible, formulated and passed Chapter 254, Laws of 1957, approved by the Governor on March 19, 1957. Think of this! The people themselves on November 6, 1956, declared that no monies shall be expended for other than cost of construction, reconstruction, maintenance and repair of public highways, roads, streets and bridges, etc. (section 1b, Art. XII, supra). However, from the time the Governor proclaimed this constitutional provision on December 28, 1956, until the passage of House Bill 122, now Chapter 254, Laws of 1957, it was just sixty-nine days that it took the Legislature to attempt to subvert the mandate and will of the people. By Chapter 254, supra, the Legislature has attempted to get around the above-constitutional amendment, or to bring said act within said amendment by declaring in Chapter 254, subd. (c) that "The cost of relocating utility facilities in connection with any project on the federal-aid primary system or federal-aid secondary system or on the interstate system is hereby declared to be a cost of highway construction."

Any voter at the constitutional election of 1956 would rightly declare that under the above-constitutional provision (section 1b of Article XII) the relocating of the pole lines or pipe lines of a private or public utility is not to be construed as "construction or reconstruction" of a state highway.

The Supreme Judicial Court of the State of Maine in Opinion of the Justices, 152 Me. 449, 455, 132 A.2d 440, 443, wherein the same question was submitted to the court, held that "In our opinion the relocation of a utility facility is not to be construed as construction or reconstruction of a highway within the meaning of Art. IX, Sec. 19 of the Constitution.

"We do not commonly consider that a power company in erecting a pole line or a water district in laying a pipe in a highway is constructing a highway. To an even lesser degree would we consider the construction of a pole line or a water pipe across country to be the construction or reconstruction of

a highway, although the reason for the relocation was occasioned solely by changes in the highway.

"The language of the Constitution should not, in our view, be extended beyond its plain and ordinary meaning."

Under Chapter 254, Mont. Session Laws of 1957, supra, as interpreted by the majority opinion, is it possible that the State of Montana is now donating and granting to such utilities through the State Highway Commission the right to now convert the permissive use such utilities had of the highways of our state, to a permanent property right in our highways? If so, and of course that is the holding, then such a valuable grant, donation and gift by the State of Montana, through the Montana Highway Commission from its highway funds, runs absolutely counter to, and transgresses section 1, of Article XIII, Constitution of Montana, which declares so far as pertinent here that *the state shall never make any donation or grant, by subsidy or otherwise, to any individual, association or corporation.*

Under the debates in the constitutional convention, it is apparent that the people adopted section 1, Article XIII, supra, for the very purpose of protecting themselves from themselves and as protection from the insistent corporate pressure on Legislators.

"The provisions of this constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." Mont. Const., Art. III, § 29.

This positive prohibition of our State Constitution (section 1, of Article XIII) prohibits the Legislature from making any donations, grants or gifts of any of the peoples' money which is derived from fees, excises or license taxes paid into the state treasury to any corporation or association. It is all inclusive and is both mandatory and prohibitory and is applicable to the Legislature and the people in their legislative capacity. As there is no legal right or legal claim of the utilities upon the State of Montana, or upon the State Highway Commission

for the money to locate or relocate their facilities, the payment out of the peoples' money in the highway trust fund for such purpose is a straight donation and grant of the same and such donation, grant or gift is clearly in violation of the above-quoted section 1, of Article XIII, of our State Constitution regardless of all the verbiage and dissertation to the contrary.

The people of Montana, by approving this constitutional provision (section 1b of Article XII) on November 6, 1956, known and promulgated as the highway antidiversion fund amendment, knew that they were nailing down these state highway funds so that they would be used and expended only for the specific purposes therein specified. The purposes therein specified had and have an unstrained easy common meaning. At the time this amendment was lobbied, campaigned for, and passed by the people, the people well-knew, and now know, that they mandatorily informed all the people, the Legislature included, that ''No monies paid into the state treasury'' to the credit of the highway fund shall be expended for any other purpose than:

(1) Cost of administering the laws under which such monies are derived;

(2) Statutory refunds and adjustments provided therein;

(3) Payment of highway obligations;

(4) Cost of construction and reconstruction of highways;

(5) Maintenance and repair of the public highways, public roads, public streets and public bridges; and

(6) The cost of dissemination of public information relating to the public highways, public roads, public streets and public bridges of the State of Montana in the sum as authorized by the Legislature for the dissemination of such information.

The people delegated to their Legislature only one item, and that was to make an appropriation for the dissemination of public information and nothing else.

In the event the people had wanted to donate, or grant or give to the utilities these millions, and if the people had wanted any

peculiar and unrestrained definition of "cost of highway construction", they would most certainly have had it written into such constitutional provision. Section 1b, Art. XII. Under this provision, they certainly did not instruct or authorize the Legislature to define the cost of highway construction to mean and include 75 percent, nor any percent of all the costs of utilities in moving their pipes, mains, conduits, cables, wires, towers, poles, and other equipment and appliances, and a new right-of-way, and from a permissive use, to a grant of a valuable property right, thereby decreasing the quotient of public ownership in our public highways, streets, roads and bridges of the State of Montana, which are held in trust for all of us and our childrens' children by the State.

It should be noted that the people, in their constitutional provision (section 1b, Art. XII), did not authorize the Legislature to make any rule, regulation or interpretation of that provision; it only permitted the Legislature to appropriate the amount to be used for disseminating information. This is very significant and the constitutional provisions are self-executing. May the Legislature now assume this Court's prerogative in interpreting and defining our Constitution and its provisions? If so, we no longer have a system of democracy in a republic of three equally balanced departments of government.

These public highways, held in trust by the State for all of the people, may not be frittered away to private or public utilities if our constitutional form of government is to prevail.

Under the common law, and under our Constitution, no one, the Legislature, the Governor, nor this Court may divest the State of its sovereign and complete ownership of all public highways unless and until the people themselves do so in their Constitution. These public highways are not only held in trust for the people by the State, but are controlled under the police power of the State, which cannot be waived or set aside until the Constitution so directs.

In the famous case of Marbury v. Madison, 1 Cranch 137, 177,

2 L.Ed. 60, Chief Justice Marshall held that "The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

"If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable."

The Legislature may, by statute, declare the public policy of this State as long as the statute does not infringe on the Constitution. In other words, a statute passed in accordance with law may declare the public policy, but a statute cannot declare the public policy contrary to the supreme law of the land, the Federal and State Constitutions. As was said in City of Cincinnati v. Harth, 101 Ohio St. 344, 128 N.E. 263, 266, 13 A.L.R. 308, "The duty of the court is to uphold the Constitution, even if that act shall temporarily operate to the hinderance of some beneficial result."

It has been argued that it is only equitable and just for the Legislature to pay to the utility corporations, the costs of relocating their facilities. That may be, but the legislative power is restricted, by our Constitution, as above-noted.

The fact is, that Constitutions do not vary with the changing tides of the legislators' desires. The people themselves expressed their will in their Constitution, and it is hornbook law that such prohibitions written into the Constitution are inflexible and are the fundamental law of the land until the people themselves change their Constitution by their vote. This Constitution must be interpreted and declared by the Court as understood and declared at the time it was approved.

The case of Oswego & Syracuse R. R. Co. v. State, 226 N.Y. 351, 124 N.E. 8, depended on by defendants, and quoted from at length in the majority opinion, has no valid application here

for the reason that the railroad company had a fee right-of-way, which it, the railroad company, had bought and paid for. Here, in this case, the utilities do not have a fee, but only a permission to place their facilities.

Since the peoples' approval of their constitutional provision at the general election of November 6, 1956, known as the anti-diversion provision (section 1b, Art. XII) the monies therein mentioned were by the people declared to be trust funds, in the state treasury, to be used only for the purposes therein provided, and it is self-enforcing. By that constitutional act the people themselves made the State of Montana responsible for these tax funds, not the Highway Commission. Isn't it peculiar and strange that the State of Montana, and the State Treasurer, who, by section 1b of Article XII, were made the guardians and trustees of these tax monies, were not even made parties to this law suit, and that these millions of dollars of your taxes on gasoline and oils, etc., may be granted and donated and given to defendant corporations without your State of Montana having a chance to even advance your constitutional provisions which many lawyers believe prohibit such donations, the State of Montana and the State Treasurer being necessary parties herein.

It cannot be denied that the cost of construction, reconstruction, relocating, and repairing of a public highway is for a public governmental function, and that expenditures therefor are not prohibited by the Constitution. It is also certain that under our Constitution the cost of locating and relocating and providing a new location for a utility or utilities, personal, private and public in nature, no part of which is state or federal property, nor under the absolute control of the State, cannot lawfully be paid by the State of Montana out of any funds in the state treasury, either by and through the State Highway Commission, the Governor of this State, the Legislature, or this Court. Section 35, of Article V, of our Constitution, prohibits the Legislature from making any appropriation for charitable, industrial or benevolent purposes to any corporation, person or

community which is not under the absolute control of the State.

It is manifest that Chaper 254, Laws of 1957, was enacted to extend the credit of the State to said corporations, persons, communities and utilities, none of whom are under the absolute control of the state, for the purpose of insuring and reimbursing them for 75 percent of all costs they may incur in locating or relocating their poles, lines, pipes and other facilities and for 75 percent of a new location and right-of-way, if necessary. There is no limit, under Chapter 254, supra, as to the amount that may be paid to said utilities under the 75 percent gift, grant and donation. After the State pays them these proposed millions precisely what part or portion of the beneficiary corporation, community or utility will belong to the State of Montana?

Is Chapter 254, supra, the entering wedge in the process of divesting the individual and the private enterprise of their utility assets so that eventually they may be taken over and operated by our Federal Government? These utility lines so located or to be located along and under our government owned highways are exposed to the greatest danger in event of a bombing or other war emergency. All these highways would prove to be first targets in any such emergency and their destruction would mean the destruction of the utility facilities there situate.

In my opinion, the Supreme Court of New Mexico in State Highway Commission of New Mexico v. Southern Union Gas Company, a Delaware Corporation, 65 N.M. 84, 332 P.2d 1007, rehearing denied 1959, 65 N.M. 217, 334 P.2d 1118, states the law. Said decision was followed in another case set forth in Id., 65 N.M. 98, 332 P.2d 1017. The New Mexico Supreme Court had under consideration a legislative act of their Legislature, Chapter 237, Laws of 1957, which for all intents and purposes is identical with our Chapter 254, Laws of 1957. New Mexico's Constitution also contains a section (section 14 of Art. IX of the New Mexico Constitution) which for all intents and purposes is like section 1, of Art. XIII, Mont.Const., in which the people declared that the State shall never make any grant or donation

by subsidy or otherwise to any corporation, company or association, except as to such ownership as may accrue to the State by operation of law. The New Mexico Court, in a brilliant, exhaustive, and well-reasoned opinion which, paraphrased, held that the Constitution makes no distinction as between donations, grants, or gifts and whether they be for a good cause or a questionable cause, and prohibits them all. In restraining their Legislature in this cause in attempting to donate a sum now in excess of ten million dollars and amounting to untold millions of dollars in the future, it was held that designated sections of Chapter 237, Laws of 1957, are repugnant to section 14, of Art. IX, of the Constitution of New Mexico and therefore invalid.

The Supreme Court of Idaho had the same question before it in State of Idaho v. Idaho Power Company, 1959, 81 Idaho 487, 346 P.2d 596, 612, in which that court in an exhaustive opinion (which reflects great credit on their court) covering an act of their Legislature, being Chapter 227 of the Idaho Session Laws of 1957, similar to our Chapter 254, Montana Session Laws of 1957, and providing as our Chapter 254 does that the cost of relocating, etc., of a utility shall be a part of the cost of construction, etc., of the highways in the highway system. The Supreme Court of Idaho in the above-mentioned case, after setting out the facts and placing their Chapter 227, Laws of 1957, alongside of their constitutional prohibition, being section 2 of Art. VIII, which, for all intents and purposes here, is the same as our section 1 of Art. XIII, and, after reviewing all other decisions relating to such question, stated that the Idaho Session Laws, Chap. 227, Idaho Code, § 40-120(27) does not meet the test required by our Constitution and "We therefore hold that I.C., § 40-120(27) providing that costs of relocation of utility facilities shall be a part of the acquisition of rights-of-way, easements and other rights for and the construction, maintenance, repair, improvement and development of the public highways in the highway system included in any project on the federail-aid primary or secondary systems or on the interstate

system, to be paid by the State of Idaho out of the dedicated State Highway Fund, is violative of Idaho Constitution.''

Should any lawyer or person place our constitutional provision (section 1, Article XIII) and our antidiversion constitutional provision (section 1b, Article XII) alongside of Chapter 254, Laws of 1957, they will quickly observe the conflict and the repugnancy of said Chapter 254, now section 32-1625, R.C.M. 1947, with our constitutional provisions.

Because Chapter 254, Laws of 1957, which provides that all cost of locating or relocating, up to 75 percent thereof, of utility facilities is declared to be a cost of highway construction, to be paid out of the dedicated trust funds of the State highway fund, by and through the said State Highway Commission, is in direct conflict with our State Constitution, section 1, of Article XIII, and the peoples' antidiversion constitutional provision of December 28, 1956, now section 1b, of Article XIII, of our Constitution, the said Chapter 254, Laws of 1957, now section 32-1625, is unconstitutional and void, I would reverse the judgment of the district court and remand the cause to enter judgment for the appellant.

MR. JUSTICE ADAIR dissenting.

I am wholly unable to agree with the majority opinion on this appeal. Accordingly, upon the grounds and for the reasons recited by Mr. Justice Bottomly in his above-dissenting opinion, I concur in such dissent.