DAVID M. PACK, Commissioner of Highways and Public
Works of the State of Tennessee, for and on behalf
of said Department, Appellant,

*v.*

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY,
INC., Appellee,

DAVID M. PACK, Commissioner of Highways and Public
Works of the State of Tennessee, for and on behalf
of said Department, Appellant,

*v.*

CITY OF MEMPHIS, by and through its Mayor and Com-
missioners, William B. Ingram, Claude Armour,
James Moore, Hunter Lane, Jr. and Pete Sisson,
Appellee,

DAVID M. PACK, Commissioner of Highways and Public
Works of the State of Tennessee, for and on behalf
of said Department, Appellant,

*v.*

MEMPHIS LIGHT, GAS AND WATER DIVISION OF the CITY
OF MEMPHIS, by and through its Commissioners, Ray
Morton, Edmund Orgill, Martin J. Lichterman,
Appellee.

387 S.W.2d 789.

(*Jackson,* April Term, 1964.)

Opinion filed March 4, 1965.

504

HANOVER, HANOVER, HANOVER & WALSH, Memphis, GEORGE F. McCANLESS, Attorney General, J. MALCOLM SHULL, Assistant Attorney General, Nashville, for appellant.

JAMES L. BOMAR, JR., Shelbyville, ROANE WARING, JR., WARING, WALKER, COX & LEWIS, Memphis, T. G. PAPPAS,

J. O. BASS, BASS, BERRY & SIMS, Nashville, for Southern Bell Tel. & Tel. Co., Inc.

PATRICK JOHNSON, SR., City Attorney, CLIFFORD D. PIERCE, JR., Assistant City Attorney, Memphis, for City of Memphis, etc.

CHARLES C. CRABTREE, WILLIAM A. SANDS, FRANK B. GIANOTTI, JR., E. BRADY BARTUSCH, Memphis, for Memphis Light, Gas and Water Division. etc.

MR. JUSTICE DYER delivered the opinion of the Court.

These three suits place in issue the constitutionality of Chapter 368, Public Acts of Tennessee for 1963. Although there are three separate utilities involved in this litigation (ranging from privately to publicly owned bodies), they all stand on the same footing for at least two reasons.

First, the activities engaged in by the City of Memphis, a municipal corporation, are of a proprietary character. *Nashville Electric Service v. Luna*, 185 Tenn. 175, 204

S.W.2d 529 (1947); and Prosser, Torts, Section 109 (2d ed. 1955). Those engaged in by the Memphis Light, Gas & Water Division are to provide those services to their customers within Shelby County, and are also obviously of a proprietary nature. Southern Bell is a private utility publicly regulated. Hence, for our purposes, the three will be treated equally.

Second, regardless of whether the utility facility is present by virtue of statutory permission (as is apparently the case of Southern Bell, see T.C.A. sec. 65-2105), or present pursuant to ownership of the land upon which the facility is located (as contended by the City), or is present pursuant to a franchise (the Division's contention), since the State's police power is inalienable, it *a fortiori* follows that property rights are not the determinative factor, since such rights are necessarily subject to the police power. See *Atlantic Coast Line R. Co. v. City of Goldsboro,* 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721 (1913).

This statute provides that the relocation of utility facilities such as water pipes and mains, sewer lines and other utility facilities located both above and below ground, now on the public rights-of-way, necessitated by the improvement of highways established as a part of the National System of Interstate and Defense Highways shall be made at the cost and expense of the State of Tennessee; provided the cost and expense of such relocation is eligible for Federal participation under the 1956 Federal Aid Highway Act, as amended (23 U.S.C.A. sec. 123).

This legislation has been enacted for the purpose of securing the benefits of the Federal Aid Highway Act of 1956, which authorizes the use of Federal funds to re-

imburse the state for the cost of relocating utility facilities in the same proportion as such funds are expended on a given project, with the proviso that Federal money shall not be used for that purpose when payment to the utility violates either State law or a legal contract between the utility and the State.

This Federal legislation offering to pay ninety per cent of the cost of relocating utilities has caused a number of our sister states to likewise enact legislation to take advantage of these funds. Most of these states have held such legislation valid, among them are: Opinion of Justices (1957), 152 Me. 449, 132 A.2d 440; *Minneapolis Gas Co. v. Zimmerman,* 253 Minn. 164, 91 N.W.2d 642 (1958); Opinion of Justices (1957), 101 N.H. 527, 132 A.2d 613; *Northwestern Bell Tel. Co. v. Wentz,* 103 N.W. 2d 245 (N.D.1960); *Department of Highways v. Pennsylvania Pub. Util. Comm.,* 185 Pa. Super. 1, 136 A.2d 473 (1957); *State v. City of Dallas,* 319 S.W.2d 767, aff'd. (Tex.Civ.App.1958), *State v. City of Austin,* 160 Tex. 348, 331 S.W.2d 737 (1960); *State Road Comm. v. Utah Power & Light Co.,* 10 Utah 2d 333, 353 P.2d 171 (1960); *State Highway Dept. v. Delaware Power & Light Co.,* 39 Del.Ch. 467, 167 A.2d 27 (1961); *Edge v. Brice,* 253 Iowa 710, 113 N.W.2d 755 (1962); *Jones v. Burns,* 138 Mont. 268, 357 P.2d 22 (1960); *State ex rel. City of Albuquerque v. Lavender,* 69 N.M. 220, 365 P.2d 652 (1961).

The New Mexico (Lavender) case overruled its prior decision in *State Highway Comm. v. Southern Union Gas Co.,* 65 N.M. 84, 332 P.2d 1007, 75 A.L.R.2d 408 (1958) which opinion held unconstitutional a statute similar to the one before this Court in *State ex rel. (Leech, Commissioner of Highways) v. Southern Bell Tel. & Tel. Co.,* 204 Tenn. 207, 319 S.W.2d 90 (1958) infra. The earlier

New Mexico decision had relied on the Tennessee Leech decision.

Two of our sister states have held such legislation invalid. *State ex rel. Rich v. Idaho Power Co.*, 81 Idaho 487, 346 P.2d 596 (1959); *Washington State Highway Comm. v. Pacific Northwest Bell Tel. Co.*, 59 Wash.2d 216, 367 P.2d 605 (1961). These two states, Idaho and Washington, have antidiversion clauses in their constitutions and the decision reached in each is based, in part, on these clauses. Since Tennessee does not have an antidiversion clause in her constitution, these cases would be of no great weight in the issue raised on the constitutionality of Chapter 368 aforesaid.

These antidiversion clauses prohibit the expenditure of highway funds for other than a highway purpose. Implicit in such decisions is the holding that the relocation of utility facilities is not an integral part of highway construction; hence, any reimbursement from the highway fund would violate such a clause. As will be discussed *infra*, this Court is of the opinion that since utilities are an integral part of the full use of the public rights-of-way, then necessary relocation costs resulting from a project such as that herein involved constitute an integral part of the highway construction cost. Thus, the Idaho and Washington decisions are not as persuasive as might first appear. Nor is there any merit in the argument that a different result should be reached when the obstacles impeding highway construction are unnatural (as here) or natural (as in the case where highway construction entails removal of trees, hills, etc.). If the obstacle stands in the way of the highway construction project, it must be removed (and perhaps relocated as in this case), be it natural or not.

By Chapter 170, Public Acts of 1957, Tennessee enacted legislation similar to Chapter 368 in that it dealt with the same general subject. In that case, *State ex rel. (Leech) v. Southern Bell Tel. and Tel. Co.,* supra, this Court found Chapter 170 to be invalid under Article II, Section 31 of the Tennessee Constitution, in that such required the expenditure of state funds for other than a public purpose. In his dissent in Leech, Justice Tomlinson stated *inter alia* that:

> "To assert, therefore, that the removal of these facilities of the utilities from the right-of-way for such a reason is not for a state purpose is, in my opinion, to assert that which does not square with every day logic." 204 Tenn. at 229, 319 S.W.2d at 100.

Chapter 368 requires the use of State funds in the relocation of these utilities. The question then is whether such funds will be expended for a public purpose.

■ In arriving at the decision on this question that has troubled this, and many other courts, we need to keep in mind two things. First, that the construction and maintenance of a public highway is for a public purpose and State funds may be expended thereon for that purpose. *Baker v. Hickman County,* 164 Tenn. 294, 47 S.W.2d 1090 (1932).

Second, the relocation of the utilities involved herein concerns facilities now on or in public rights-of-way, either owned by a municipality in its proprietary capacity or by a private utility company, and that their relocation has been made necessary in order that the public might have and enjoy a better highway system which modern day travel demands. The Congress of the United States recognized the necessity therefor when it passed the 1956 Federal Aid Highway Act, as amended.

■ Since 1905 under the holding in *Frazier v. East Tennessee Tel. Co.*, 115 Tenn. 416, 90 S.W. 620, 3 L.R.A., N.S., 323, Tennessee has been committed to the view that the use of public rights-of-way by utilities for locating their facilities is a proper highway use subject to their principal purpose as travel and transportation of persons and property. This principal was recognized in the case of *Johnson v. City of Chattanooga*, 183 Tenn. 123, 191 S.W.2d 175 (1945).

In support of the decision in Frazier, supra, this Court cited the Minnesota case of *Cater v. Northwestern Tel. Exch. Co..* 60 Minn. 539, 63 N.W. 111, 28 L.R.A. 310 (1895). In the case of *Minneapolis Gas Co. v. Zimmerman*, 253 Minn. 164, 91 N.W.2d 642 (1958), holding a statute similar to Chapter 368 valid, the Minnesota court cited their Cater case and said:

"Clearly since the Cater decision in 1895, Minnesota has been definitely committed to the view that the use of rights-of-way by utilities for locating their facilities is one of the proper and primary purposes for which highways are designed even though their principal use is for travel and the transportation of persons and property. Furthermore, the import of that decision is a clear recognition that the use of highway rights-of-way for the transmission of public intelligence and public utility services confers important and direct benefits upon the public and that such use is not solely for the benefit and convenience of the utilities." 91 N.W.2d at 649.

It is readily apparent that the view taken by the Minnesota court is sound since the placing of utilities upon a right-of-way is one of the proper uses of a highway thereby benefitting the public. It is a convenience

and an economic advantage to the utility users who are usually in close proximity to highways and streets. Too, we believe it to be in the interest of the public welfare to make full and efficient use of the land surface occupied by public streets and roads. To hold otherwise would be to sanction the acquiring of rights-of-way by utilities over private lands at great expense to the utilities. This would result in increased rates (passed on to the consumers) and would also interfere with the normal, practical enjoyment of private property.

In *State v. City of Austin,* 160 Tex. 348, 331 S.W.2d 737 (1960), a statute similar to Chapter 368 was held valid and in that case the court said:

"It is important to remember that utility facilities are not placed in public streets merely for the convenience of private stockholders. As stated in *Jones v. Carter,* 45 Tex.Civ.App. 450, 101 S.W. 514, 516 (wr. ref.), 'light, sewers, gas, and water works are among the common necessities of modern cities, and it is a matter of common knowledge that such plants cannot be constructed and operated without running the lines and mains along or across the streets. They are some of the common uses to which streets are necessarily devoted.' It is the interest of the public in receiving utility services which supports the right of utilities to use streets and highways for that purpose in the first place. See *State, ex Inf. McKittrick v. Southwestern Bell Telephone Co.,* 338 Mo. 617, 92 S.W.2d 612." 331 S.W.2d at 744.

■ Utilities are an integral part of the full use of the public rights-of-way, all serving the public interest, and in their removal and relocation the public has a real and legitimate interest. Such being the case, the relocation

of the utilities as contemplated by Chapter 368 is in furtherance of a public purpose. See Opinion of the Justices (1957), 101 N.H. 527, 132 A.2d 613; *Minneapolis Gas Co. v. Zimmerman,* supra; *Northwestern Bell Tel. Co. v. Wentz,* supra; *State Road Comm. v. Utah Power & Light,* supra; and *State v. City of Austin,* supra.

■■ The utilities in this case insist they have certain property rights in the public ways. We do not deem it necessary, on the issues raised in the case at bar, to decide just what property rights they do have, if any, except to say whatever property rights any of them may have, they are subject to the lawful and reasonable use of the police power of the State. In other words, the State can, under its police power, require the removal of facilities at the expense of the utility. Such is the rule of the common law and can be preserved by contract. Thus, in the absence of a valid reimbursement statute, relocation costs under the common law rule must be borne by the utilities involved.

■ The Legislature, in dealing with a subject with which the public has a real and legitimate interest and is in furtherance of a public purpose, has authority to say to what extent the State shall exercise its police power, so long as there is not a manifest abuse of such power.

The Federal Aid Highway Act of 1956 authorized a new and enlarged Federal Aid Highway Program of far-reaching consequences and is one of the great construction projects of all times. The Act recognized the Federal responsibility for the early completion of a National System of Interstate and Defense Highways, a 41,000 mile system of highways of great importance to the nation as a whole, by providing that the Federal Govern-

ment pay ninety per cent of the cost of this segment of our highway system.

It is recognized that there were economic reasons for the states to amend their laws in view of the invitation extended by the Federal Act. A crash program of unprecedented scale had been inaugurated. In addition, the type of construction changed. The modern multi-lane high-speed traffic ways require rights-of-way of spectacular width, cloverleafs, overpasses and underpasses, and long distances thereof through rural and urban areas. These changes brought about extraordinary expenditures for moving vast amounts of utility facilities at great cost.

The inequities possible under this 1956 Federal Aid Highway Act are recognized in statements made in the United States Senate, and published in 2 U.S. Congressional and Administrative News, 85th Cong. 2d Sess., p. 2398 (1958):

"In the old days, such relocation costs were encountered on a gradual and small scale. They embraced relatively minor operations in type. Their sum total was within the reach of the utilities' ability to fund same, whether the utility was publicly, privately, or co-operatively owned.

"Under the Act of 1956 all of this was heavily changed. A crash program of unprecedented scale was inaugurated. Federal funds available for highway construction rocketed from $875,000 to $2 billion within a single year. Greater increases are scheduled for following years. * * *

"These changes * * * bring about a tremendously different treatment than when highway improvement

was a local convenience and local cost, relatively speaking.

"Under the old order there was not only a smaller cost, but also a greater identity between the users of the utilities affected, and the taxpayer who provided funds for the highway improvement which resulted.

"A special unfairness which results from these costs is attributable to the Interstate Highway System. Some communities and some utilities will pay the entire load. Most of the communities and utilities, many located just a short distance away, will not pay any of the load, and yet they will benefit almost as fully from the construction of the Interstate System."

 Under these circumstances the Legislature, by said Chapter 368 elected to exercise the State's police power in the relocation of these facilities by providing that the State pay the non-betterment cost of the relocation of the facilities to be relocated under the 1956 Federal Highway Act. Such is not an abuse on the part of the Legislature in its exercise of the police power of the State.

██ A public purpose, as discussed in this opinion, has been appropriately defined by the Minnesota court in Zimmerman, supra, as follows:

"What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.

"The mere fact that some private interest may derive an incidental benefit from the activity does not deprive

the activity of its public nature if its primary purpose is public.'' 91 N.W.2d at 651.

The import of the last-quoted sentence was apparently not called to the attention of the majority in the preparation of the Leech opinion.

There is an earlier approval of the same general element in the definition of a public purpose in *Bedford County Hospital v. Browning,* 189 Tenn. 227, 225 S.W.2d 41 (1949), wherein this Court said (citing with approval a Kentucky case):

> '' 'These authorities clearly settle that the vital point in all such appropriations is whether the purpose is public; and that, if it is, *it does not matter whether the agency through which it is dispensed is public or is not;* that the appropriation is not made for the agency, but for the object which it serves; *the test is in the end, not in the means.'* '' 189 Tenn. at 236, 225 S.W.2d at 45. (Emphasis supplied.)

Thus, as noted, supra, since it is the opinion of this Court that the relocation is in furtherance of a public purpose, it follows that (using the language employed in the Bedford County Hospital case). ''* * * it does not matter whether the agency through which it is dispensed is public or is not.''

Thus, the true test of public purpose as regards the expenditure of public funds is in the end or total result, and definitely not the element of State control or use as the majority in Leech apparently held. Such a restrictive holding would abolish the end-means dichotomy approved in Bedford County Hospital, and even if no such abolition resulted, it can hardly be argued that

the element of State control in the Hospital case was anything like that of Southern Bell in the case at bar.

The Minnesota court commented on this definition as follows:

"We have already pointed out that the use of rights-of-way by utilities for locating their facilities is one of the primary purposes for which highways are designed, even though their principal use is for public travel and transportation of persons and property. It follows that where it becomes reasonably necessary to relocate such utility facilities in order to improve the highway for public travel (and especially so, as to a highway designed to facilitate interstate travel and commerce and to further the common defense) an expenditure of funds to effect such relocation is properly a governmental function exercised for a public purpose of primary benefit to the entire community. It is primarily for a public purpose not only because the relocation is made necessary in order to expedite public travel and transportation, but also for other substantial reasons." 91 N.W.2d at 651-652.

Owing to the great attention given to the non-betterment argument by counsel, both at the oral hearing and in the briefs, some mention should perhaps be made thereof in this opinion. It is doubtless true, as the utilities contend, that they would be quite satisfied not to have to move at all. It is equally true that the statute here before this Court limits the amount of reimbursement to

"the entire amount paid properly attributable to such relocation, after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility." Public Acts 1963, Ch. 368, Sec. 2 (B).

Clearly the utilities involved will stand in no better position than that in which they stood before the relocation. The test under Article II, Sec. 31 is not to be determined by the position of the recipient of the funds, but rather by the disbursement itself. In other words, assuming *arguendo* that the disbursement is not for a public purpose, the mere fact that the utility derives no net gain does not render the transaction constitutional. This because a benefit can be bestowed in either of two ways: (1) positively, i. e., by a net gain; or (2) negatively, i. e., by avoidance of a detriment.

The fact that the statute (Ch. 170, Public Acts, 1957) rendered unconstitutional in the Leech decision did not define the cost of relocation as excluding any salvage value and/or increased value through the new facility (as did Ch. 368, Sec. 2(B)) is not controlling in the case at bar. Indeed, New Mexico Laws of 1957, Ch. 237, at Section 1 (D), contained such a definition, yet was still declared unconstitutional (Southern Union Gas). The subsequent New Mexico statute (Laws of 1959, Ch. 310) contained such a definition (at section 2(B)), yet it was constitutionally upheld (Lavender).

In addition to the State's constitutional attack upon the statute under Article II, Section 31, there is one remaining constitutional infirmity contended for by the State and supported by citation of authority in its brief.

The State contends in its brief (pp. 57-60) that the statute is void for the reason that the classification is unreasonable, and the legislation special. It is well settled in this State that the test for constitutionality is whether the classification is capricious, unreasonable or arbitrary. See *Martin v. Martin*, 213 Tenn. 345, 350, 373 S.W.2d 609 (1963), citing several cases. ''And if the reasonableness

of the classification be 'fairly debatable', it must be upheld.'' *Phillips v. State,* 202 Tenn. 402, 304 S.W.2d 614 (1957).

Certainly the Legislature had the power, and indeed the duty, to make the classification herein assailed, if for no other reason than that of equity. See the language quoted supra from the U.S. Congressional and Administrative News concerning the possible inequities under the 1956 Federal legislation. Thus, the classification is inherently reasonable.

Nor is this statute void as being partial legislation. True, only a few of the State's many utility companies (relatively speaking) will be affected by this statute, yet it matters not how few are the persons who may be included in a class. If all who are in, or who may come into, the like situation and circumstances be embraced in the class, the law is general and not partial. See *Budd v. State,* 22 Tenn. 483 (1842); *Stratton Claimants v. Morris Claimants,* 89 Tenn. 497, 15 S.W. 87, 12 L.R.A. 70 (1891); and *Knoxville & O. R. Co. v. Harris,* 99 Tenn. 684, 43 S.W. 115, 53 L.R.A. 921 (1897). The statute here under consideration is accordingly a valid general law.

Thus, we hold that Chapter 368 of the Public Acts of 1963 is valid under the attacks herein leveled against it. Accordingly, for the reasons recited herein, the decree of the chancellor is affirmed.

CLEMENT, SPECIAL JUSTICE, not participating.