Olin **WEST, III**, a Citizen, Resident and Taxpayer of the State of Tennessee, in his own behalf and on behalf of all other citizens, residents and taxpayers of the State of Tennessee,

v.

**TENNESSEE HOUSING DEVELOPMENT AGENCY et al.**

Supreme Court of Tennessee.

July 15, 1974.

Thomas V. White, Nashville, for plaintiff-appellant.

C. Hayes Cooney, Asst. Atty. Gen., Stephen C. Small, Nashville, for defendants-appellees.

## OPINION

McCANLESS, Justice.

The plaintiff, describing himself as a citizen, resident, and taxpayer of the State, filed his complaint in his own right and on behalf of all other citizens, residents, and taxpayers of Tennessee who might desire to join him, in accordance with Rule 23 of the Tennessee Rules of Civil Procedure. The defendants are the Tennessee Housing Development Agency, a corporation created by the Tennessee Housing Development Agency Act, Chapter 241 of the Public Acts of 1973, the individual members of the Agency, and its Executive Director.

The plaintiff prayed for a decree adjudging the constitutional rights, duties, and obligations of the defendants and that the defendants be permanently enjoined from selling the obligations of the Agency.

Chancellor Frank F. Drowota delivered his memorandum opinion in accordance with which a decree was entered. The plaintiff has appealed. We have considered the record and because we are satisfied that the Chancellor's opinion is correct in every particular we adopt it as our own. It is, as follows:

"This is an action for a declaratory judgment brought on authority of T.C.A., § 23–1101, et seq. The defendants filed an answer to the complaint on January 8, 1974; the parties also filed certain exhibits. The parties submitted briefs and plaintiff by motion requested that these briefs be made part of the technical record; further, that oral argument be suspended and the Court decide the issues on the pleadings, exhibits, and briefs filed herein. By agreed order entered April 16, 1974, the Court granted plaintiff's motion. In this state of the pleadings, the Court is of the opinion that the case is properly disposed of under Rule 12.03, TRCP.

"By his complaint plaintiff, a citizen, resident and taxpayer of the State of Tennessee, seeks a declaration that Chapter 241, Public Acts of 1973, and known as the 'Tennessee Housing Development Agency Act,' is unconstitutional; further that the defendant agency be permanently enjoined and restrained from selling notes, bonds, or other obligations as authorized by said Act.

"For reasons hereinafter stated this Court is of the opinion that the defendants are entitled to a judgment as a matter of law. A decree will be entered declaring that Chapter 241, Public Acts of 1973, is a constitutional exercise of the police power of the State of Tennessee, and, further, denying the injunctive relief sought by the plaintiff.

## "I. THE ACT

"Section 2 of the Act begins with an identification of the problem: '. . . there continues to exist throughout the state a seriously inadequate supply of safe

and sanitary dwelling accommodations, primarily accommodations for persons and families of lower and moderate income.'

"The Act proceeds to identify what the General Assembly has determined to be a major cause of this condition, namely, 'recurrent, cyclical shortages of funds in private banking channels available for residential mortgages.'

" 'Such shortages contribute to drastic reductions in construction starts of new residential units. In addition, these cyclical shortages make the sale and purchase of existing residential units extremely difficult in many parts of the state, especially by those persons of lower and moderate income. The ordinary operations of private enterprise have not in the past corrected these conditions.'

"Having set forth the condition sought to be remedied and a major cause of that condition, the Act then sets forth several specific harmful effects of this condition.

*First.* This condition is contrary to the public interest and threatens the health, safety, welfare, comfort and security of the people of the state and is inimical to the sound growth and the development of its communities. An adequate supply of housing of a variety of housing types serving persons and families of all income levels and properly planned and related to public transportation, public facilities, public utilities and sources of employment and service is essential to the orderly growth and prosperity of the state and its communities.

*Second.* It is further found and declared that the drastic reduction in residential construction starts associated with such shortages cause a condition of sustained unemployment and underemployment in the construction industry which results in hardships to many individuals and families, wastes vital human resources, increases the public assistance burdens of the state and municipalities, impairs the security of family life, impedes the economic and physical development of municipalities and adversely affects the welfare and prosperity of all the people of the state. A stable supply of adequate funds for residential mortgages is required to spur new housing starts in an orderly and sustained manner and thereby to reduce the hazards of unemployment and underemployment in the construction industry.

*Third.* It is further found and declared that these conditions associated with such recurrent shortages of residential mortgage funds contribute to the persistence of slums and blight and to the deterioration of the quality of the environment and living conditions of a large number of persons residing in the state of Tennessee, having adversely affected the economy of the state as a whole, and are contrary to the declared policy of the state to promote a vigorous and growing economy, to prevent economic stagnation, to increase revenues to the state and to its municipalities and to achieve stable local economics.

"With this background, the Act then sets forth the cental purpose of this remedial legislation and outlines the means which the General Assembly has determined will accomplish that purpose, in the following language:

" '. . . To bring greater stability to the residential construction industry and related industries, and thus to assure a steady flow of production of new housing units, the Tennessee Housing Development Agency shall be given the power to raise funds from private investors through issuance of its bonds and notes to (i) make funds available to sponsors, developers and builders for financing land development and residential housing construction for lower and moderate income persons and families; (ii) to make funds available to sponsors, developers, builders and purchasers for permanent mortgage financing of housing for lower and moderate income persons and

families; and (iii) to purchase existing insured mortgages from lenders within the state and direct an amount equal to the proceeds from the liquidated mortgage investments into new mortgages on residential real property; and (iv) to enter into advance commitments with lenders to purchase insured mortgage loans made to persons and families of lower and moderate income; and further, to provide technical, consultative and project assistance services to sponsors of land development or residential housing; and to assist in coordinating federal, state, regional and local public and private efforts and resources to otherwise increase the supply of such residential housing.'

"The Act, then in twenty succeeding sections sets out in detail the particulars by which this legislative design is to be accomplished.

## "II. CONSTITUTIONAL CHALLENGES

■ "Before detailing plaintiff's objections to the Act, it is well to note that every act of the General Assembly comes to the courts with a strong presumption in favor of its constitutionality. Memphis Freight Co. v. City of Memphis, 44 Tenn. 419 (1867); LaFever v. Ware, 211 Tenn. 393, 365 S.W.2d 44 (1963). The determination by the General Assembly, a co-equal branch of government, that the act is constitutional is entitled to great weight. Thus plaintiff must bear a heavy burden in establishing some constitutional infirmity of the Act in question.

"FIRST. Plaintiff argues that the Act serves no public purpose and, therefore, the Act's authorization of the expenditure of public monies is unconstitutional and illegal. By brief plaintiff argues that 'neither the U.S. Constitution nor any other primary source of law in the U.S. gives individuals the right to housing provided by the state in which they live. Although public safety is definitely a concern of each state government, the Plaintiff contends that the State of Tennessee does not have as one of its functions the obligation to provide such housing.'

"This argument misconceives the issue. The issue is not whether an individual has a *right* to adequate housing which, upon demand, the state has the *obligation* to provide. Rather the issue here is whether the State of Tennessee, acting through its General Assembly, has the *power* under our Constitution to use the means set forth in the Act to remedy the problem identified. In the absence of an express or implied prohibition, the General Assembly has all power of legislation. Peay v. Nolan, 157 Tenn. 222, 7 S.W.2d 815 (1928); State v. Graham, 161 Tenn. 557, 30 S.W.2d 274 (1930); Fentress County Beer Board v. Cravens, 209 Tenn. 679, 356 S.W.2d 260 (1961); Perry v. Lawrence County Election Commission, 219 Tenn. 548, 411 S.W. 2d 538 (1967), cert. den. 389 U.S. 821, 19 L.Ed.2d 73, 88 S.Ct. 44.

"The gist of plaintiff's argument is that, 'since only a portion of the State's populace—described in the Act as low and moderate income individuals—will personally benefit by being eligible to live in the proposed housing, the "community as a body" as stated in the [Pack v. South Central Bell Telephone Company, 215 Tenn. 503, 387 S. W.2d 789 (1965)] decision, will not be served. Since supportive [sic] subsidies to essentially private home buying makes public funds available for private uses, any public benefit will therefore be remotely secondary.'

■ "The Court finds no merit in this contention. The General Assembly's explication of the myriad harmful effects caused by housing shortages makes clear that the problem has social and economic consequences far beyond the individual family which cannot find safe and sanitary dwellings within its means. This problem affects the vitality of the construction industry and the level of employment, both of which have far-reaching consequences

of their own, as well as the more obvious problems related to the presence of slum dwellings in our communities, problems which have commanded the attention of our Supreme Court. See, Knoxville Housing Authority, Inc. v. City of Knoxville, infra, [174 Tenn. 76] at 83, 123 S.W.2d [1085] at 1087.

"In this day we have been made accutely aware that our economy is a highly interdependent one; the economic stress which one individual, or household, or firm, experiences has an effect on the economic well being of us all. In such an interdependent economy, it makes no sense to argue that this plan will benefit only one sector of the economy, to the exclusion of the remainder. This Court is of the opinion that the expenditure of public funds authorized by this Act does fulfill a public purpose, benefitting the citizens of Tennessee as a body.

"Long ago our Supreme Court had occasion to note that the concept of public use is a flexible one. 'It varies and expends with the growing needs of a more complex social order.' Ryan v. Terminal Co., 102 Tenn. 111, 116, 50 S.W. 744, 745 (1898). 'The novelty of a purpose does not render it any less a public purpose. The conception of a public purpose must necessarily broaden as the functions of government continue to expand.' Knoxville Housing Authority, Inc. v. City of Knoxville, et al., 174 Tenn. 76, 84, 123 S.W.2d 1085, 1088 (1939).

"Counsel for defendant Agency had cited the opinion of courts of many sister jurisdictions where the constitutionality of similar acts had been challenged. Without detailing those cases here, it will suffice to note that sister courts have been virtually unanimous in characterizing acts similar to the one in question as serving a public purpose; all of which reinforces the conclusion reached above that this Act is designed to serve a public purpose.

■ "SECOND. The plaintiff next argues that even if the Agency serves a public purpose, the means adopted by the Act are not reasonably designed to achieve that purpose.

"This contention is likewise without merit. The underlying conditions which the Act is designed to remedy are recurrent, cyclical shortages of funds in private banking channels to finance residential mortgages. Every substantive provision of the Act is calculated to make funds available at economically feasible rates by having the state acquire capital at favorable rates, by virtue of its tax-exempt status, and then making these funds available as needed.

"Whether the solution adopted by the General Assembly is the best possible response to the problem or whether it will actually bring the desired results, is not a concern of the courts. That is a policy decision within the exclusive province of the Legislature. Having determined that the means adopted by the Legislature appear reasonably calculated to effect the purposes of the Act, the Court has exhausted its function in this respect.

■ "THIRD. The complaint alleges that the Act permits the Tennessee Housing Development Agency to engage in an invalid proprietary function. This point is not pursued in the brief, and is considered as abandoned. Nevertheless, it may not be superfluous to note that if, as has been determined above, the purpose of the Act is a valid public purpose, it follows that the Agency may own, acquire, dispose of, and otherwise deal with the property in pursuance of that public purpose.

■ "FOURTH. It is next contended by plaintiff that in certain particulars this Act amounts to an unconstitutional delegation by the Legislature of the legislative power which by Article 2, §§ 1–3 of the Constitution of Tennessee is reposed exclusively in the General Assembly.

"Plaintiff argues as follows: 'The "General Powers" section of the Act, for example, gives the Housing Development Agen-

cy power of almost "edict" size proportions:

> The Agency shall have *all* of the powers necessary and convenient to carry out and effectuate the purposes and provisions of this Act. . .' [Emphasis supplied by the Brief.]

The determinative part of the quoted section is not the word 'all,' but rather the words 'necessary and convenient.' The agency is given such powers as are both necessary and convenient to the accomplishment of agency purposes, purposes which have been determined to be public in nature. 'Necessary and convenient' is the limiting standard.

■ "A more serious and specific charge is that Section 3(10) of the Act defines 'low and moderate income individuals' in such vague, limitless terms that the Agency could conceivably include any group; that this power to define the persons eligible for assistance under this Act, given without any limiting standard, is in essence a conferral of the legislative prerogative in violation of Article 2, §§ 1–3.

"Section 3(1) provides as follows:

> " '(10) "Persons and families of lower and moderate income" means persons and families irrespective of race, creed, national origin, age or sex deemed by the agency to require such assistance as is made available by this act established for each city or county by the board of directors. In establishing these income limits, the board of directors shall be required to take into consideration without limitation such factors that will insure for the citizens of each city and county the opportunity to live in equal quality housing relative to their needs including the following:

> (a) The amount of the total income of such persons and families available for housing needs;

> (b) the size of the family;

> (c) the cost and condition of housing facilities available including consideration of the following:

> (i) cost of a typical dwelling lot,

> (ii) cost of materials,

> (iii) cost of labor,

> (iv) cost of real estate taxes,

> (v) cost of home owners or renters insurance;

> (d) the eligibility of such persons and families for federal housing assistance of any type predicated upon a lower income basis;

> (e) the ability of such persons and families to compete successfully in the normal housing market and to pay the amounts at which private enterprise is providing decent, safe and sanitary housing, and deemed by the agency therefore to be eligible to occupy residential housing constructed and financed, wholly or in part, with insured construction loans or insured mortgages, or with other public or private assistance.

"There are several significant features of this definition. First, a city-by-city, county-by-county approach in determining the need is indicated. The wisdom of such approach is apparent when consideration is given to the great disparity of conditions between different parts of the state, even between certain counties and cities within those very counties. Second, in making these local determinations of need, the Act establishes a number of specific and relevant factors which the board of directors is required to consider.

"Obviously, the highly detailed determinations which the Act commands to be made are clearly such as are best left to an administrative body. Once the Legislature has determine that, to be effective, the plan must be responsive to the peculiarities of need of a given locality, it is competent for the Legislature to delegate the function of quantifying that need to an administrative agency.

"It is further to be noted that when Section 3(10) is read together with other relevant portions of the Act, much of its apparent vagueness disappears. For example, Section 4 provides in pertinent part as follows:

" 'The agency shall establish a housing cost index as defined in subsection 12 of section 3 of this act to be computed monthly or at such time or times as the agency in its discretion may require. The housing cost index shall serve to determine what percentage of the average Tennessee household's gross monthly income is required to pay for primary fixed housing costs under then existing housing market conditions and to establish a basis for a threshold at which the financial assistance programs of this act will become effective. Thus, it is hereby found and declared that when primary housing costs as defined by the housing cost index, reach or exceed twenty-five percent (25%) of an average Tennessee household's gross monthly income, a majority of Tennessee citizens are excluded from the normal housing market; and in light of that finding, when the housing cost index reaches or exceeds a factory of twenty-five percent (25%) and upon the approval of the board of directors, the financial assistance programs established in this act will become operative to aid in providing adequate housing for lower and moderate income persons and families as defined by subsection 10 or section 3 of this act.'

"The Act thus creates an objective index of housing costs and specifies a point at which the increasing proportion of family income consumed by housing costs dictates that the financial assistance programs become operative. Section 4 thus declares, '. . . when primary housing costs as defined by the housing cost index, reach or exceed twenty-five percent (25%) of an average Tennessee household's gross monthly income, a majority of Tennessee citizens are *excluded* from the *normal housing market.* . .' [Emphasis supplied.] Factor (e) in Section 3(10) is, 'the ability of such persons and families to *compete successfully* in the *normal housing market* and to pay the amount at which private enterprise is providing decent, safe and sanitary housing. . .' [Emphasis supplied.] Read together, the two sections establish an objective standard; to wit, when the twenty-five percent level is reached a person or family is conclusively declared to be excluded from the normal housing market, i. e., he is unable successfully to compete in the market, and the requirement of factor (e) in Section 3(10) is, *ipso facto,* met.

"From all the foregoing, it is the conclusion of the Court that Section 3(10) does not give the Agency unbridled authority to define the conditions under which the remedial provisions of the Act may be exercised. There is no unconstitutional delegation of legislative authority here.

■ "A third instance of an overly broad delegation of legislative power, according to plaintiff, is the power given to the Agency to decide '. . . what mortgages to acquire in assisting Tennessee homeowners and second, the appropriate monthly home payments based on the individuals' monthly income and the agency-calculated housing cost index.' Obviously these matters fall particularly within the competency of an administrative body. To require the General Assembly to make these day-to-day decisions in the administration of the plan would make it totally unworkable.

"In sum, this Court can find no instance in which the power granted the Housing Development Agency exceeds that permissible delegation of administrative discretion sanctioned by our Constitution.

■ "FIFTH. The fifth ground of complaint is that the Act violates Article II, § 17, Constitution of Tennessee, because it does not contain in the title to the Act one clearly expressed subject. The cited section provides in pertinent part as fol-

lows: 'No bill shall become a law which embraces more than one subject, that subject to be expressed in the title.'

"The title of Chapter 241, Public Acts of 1973 follows:

" 'AN ACT to increase available funds for the financing of residential housing for persons and families of lower and moderate income and creating the Tennessee Housing Development Agency; defining its duties, powers and responsibilities; and authorizing the issuance of bonds and notes of the agency to assist in the financing of such housing, and providing for the terms, security, payment and taxation thereof.'

"The quoted title contains one clearly expressed subject or purpose, namely, increasing available funds for financing of residential housing for persons of lower and moderate income. The title additionally specifies the Agency through which this purpose is to be accomplished; additionally, it indicates some of the means by which the agency may accomplish this purpose.

■ "Our Supreme Court has often expressed itself on this subject. In Memphis State Railway v. Byrne, 119 Tenn. 278, 299–300, 104 S.W. 460, 465 (1907), the Court said, 'When a statute has but one general object or purpose, the statute is single, however multitudinous may be the means or instrumentalities provided for effecting that purpose.' Accord, Witt v. McCanless, 200 Tenn. 360, 292 S.W.2d 392 (1956).

"Under this standard this Court finds that the title of Chapter 241, Public Acts of 1973, contains one clearly expressed subject, and that all sections of the Act subserve that one purpose.

■ "SIXTH. Plaintiff argues next that the Act creates a corporation by special act and thus is violative of Article 11, § 8, Constitution of Tennessee.

"The short answer to plaintiff's contention is that the section cited has uniformly been held to apply only to private corporations:

" 'The constitutional provision that "No corporation shall be created, or its powers increased or diminished by special laws," applies alone and exclusively to private corporations, and has no application to public or municipal corporations.' [Citations omitted.] Roberts v. Brown, 43 Tenn.App. 567, 596, 310 S.W.2d 197, 210 (1957), cert. den. February 6, 1958.

■ "SEVENTH. It is contended that the proposed issuance of bonds under the Act constitutes a lending or pledging of the credit of the state in violation of Article 2, § 31, Constitution of Tennessee, which provides as follows:

" 'The credit of this State shall not be hereafter loaned or given to or in aid of any person, association, company, corporation, or municipality; nor shall the State become the owner in whole or in part of any bank or a stockholder with others in any association, company, corporation, or municipality.'

"Again it appears that the provisions of Article 2, § 31, have been qualified by the 'public purpose' criterion. The question was authoritatively dealt with by our Supreme Court in Bedford County Hospital v. Browning, 189 Tenn. 227, 225 S.W.2d 41 (1949), where the Court concluded that the giving of the state's credit for non-public purposes only is prohibited by Article 2, § 31. Discussing this section the Court noted as follows:

" 'The obvious purpose of this Section of our Constitution was to prevent the State from using its credit as a gratuity or donation to any person, corporation, or municipality. It is further obvious that it was not designed to prevent the State from using its credit to aid persons, corporations, or municipalities if required to accomplish a State or public purpose, or to fulfill a State duty or obligation under its police power. Under the authorization, the Legislature and

not the courts is the exclusive judge of the manner, means, agencies and methods to meet and fulfill these purposes.' 189 Tenn. at 32 [225 S.W.2d 41].

"In that same opinion the Court cited with approval the following language of the Court of Appeals of Kentucky, construing the analogous provision in the state constitution of Kentucky, and validating thereunder an annual appropriation to the Kentucky Children's Home Society, a private corporation, organized for purely charitable purposes: "These authorities clearly settle that the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or not. . .' Hager v. Kentucky Children's Home Society, 119 Ky. 235, 83 S.W. 605, cited at 189 Tenn. 236 [225 S.W.2d 41].

"Thus the gravamen of a complaint asserting Article 2, § 31, appears to be the giving or lending of the State's credit in aid of a private purpose. Since this Court had determined that the purpose of this Act is public, complaint under Article 2, § 31, is foreclosed.

"EIGHTH. Finally plaintiff asserts the invalidity of the Act on grounds that it violates Article 2, § 28, Constitution of Tennessee, by creating an unconstitutional tax exemption. That section provides *inter alia*, that 'the Legislature may except such [property] as may be held by the State, by Counties, Cities or Towns, and used exclusively for public or corporation purposes. . .'

"Again, the prior determination that a public purpose is served by the Act determines this constitutional claim. Since the Agency serves a public purpose, the General Assembly may exempt its property from ad valorem taxation.

"Having resolved each contention in favor of the constitutional validity of the Act, it results that the Act is in all respects a constitutional enactment of the General Assembly.

"Decree accordingly."

We have considered the appellant's several assignments of error. They present the same contentions that were made before the Chancellor and which the Chancellor rejected in his opinion. We overrule all the assignments and affirm the Chancellor.

DYER, C. J., CHATTIN and FONES, JJ., and LEECH, Special Justice, concur.