## METROPOLITAN DEVELOPMENT AND HOUSING AGENCY, Plaintiff-Appellant,

v.

## SOUTH CENTRAL BELL TELEPHONE COMPANY et al., Defendants-Appellees.

Court of Appeals of Tennessee, Middle Section.

Oct. 28, 1977.

Certiorari Denied by Supreme Court March 13, 1978.

Joseph L. Lackey, Jr., Lackey, Alexander & Jackson, Nashville, for plaintiff-appellant.

J. O. Bass, Bass, Berry & Sims and Harry Mittwede, Nashville, for defendants-appellees.

OPINION

DROWOTA, Judge.

In this suit for declaratory judgment, plaintiff Metropolitan Development and Housing Agency urges that a state statute which requires it to reimburse defendant utilities for the cost of relocating their equipment to further certain urban renewal projects is an unconstitutional impairment of several of plaintiff's contracts.

Plaintiff Metropolitan Development and Housing Agency, formerly the Nashville Housing Authority, is recognized at § 18.04 of the Charter of the Metropolitan Government of Nashville and Davidson County as both a city and county housing authority created pursuant to T.C.A. §§ 13–901—13–919 and §§ 13–1001—13–1011, respectively. These sections of the Code provide that such an agency is a "public body corporate" and charge it with carrying out the provisions of the Housing Authorities Law, Chapters 8 through 11 of Title 13 of the Code. The agency is vested by the State with a number of powers, many of which appear to have been designed to allow the agency to improve housing conditions in its area by the construction of new housing projects. See T.C.A. §§ 13–804—13–805.

Pursuant to its statutory authority, plaintiff in the 1960's and 1970's has embarked on three urban renewal projects in Nashville which have given rise to the instant suit. These projects are financed by loan and grant contracts between plaintiff and

the federal Department of Housing and Urban Development (HUD). These contracts provide that the federal government will furnish ⅔ of the funds needed for the projects while the local authorities furnish the remaining ⅓. The local authorities receive "in-kind" credits toward their ⅓ share for work they actually do on the projects. Relocation of lines and equipment by defendant Electric Power Board, known as Nashville Electric Service (NES), an independent agency of the Metropolitan Government of Nashville and Davidson County (Metro), would qualify for this in-kind credit if paid for by NES. Also involved in these projects are so-called "cooperation agreements" between plaintiff and Metro, contracts in which Metro agrees to cooperate with plaintiff and aid the urban renewal projects in specified ways.

In addition to the contracts between HUD and plaintiff and between Metro and plaintiff, a third set of contracts is important in this litigation. These are the franchise agreements entered into between Metro and each of the defendant utilities except NES. The franchises in each case are agreements in which the city gives the utility the right to maintain its facilities and do business within the municipal limits and on municipal rights of way, and which set forth various conditions with which the utility is required to comply. These franchise agreements are currently in force between Metro and the following defendant utilities: South Central Bell Telephone Company (South Central Bell), Nashville Gas Company (Nashville Gas), Colonial Pipeline Company (Colonial), and Western Union Telegraph Company (Western Union). NES, the only other defendant in the case, does not operate under a franchise agreement but, as an independent agency of Metro government, is controlled by provisions set forth in Appendix III to the Metro Charter.

The three urban renewal projects in question required the relocation of some equipment of all of the defendants in order to proceed. At common law, that is, in the absence of any valid legislative enactment to the contrary, the cost of such relocation

is a non-compensable harm to the utility and must be borne by it. See *Pack v. Southern Bell*, 215 Tenn. 503, 387 S.W.2d 789 (1965). In the instant situation, the urban renewal plans were developed and most of the contracts discussed above were made when this was the state of the law. In 1971, however, the State legislature passed T.C.A. §§ 13–828—13–831, the statutory provisions attacked by plaintiff in this case. After stating its findings and defining its terms in §§ 13–828 and 13–829, the legislature goes on to require utilities to be reimbursed for the cost of relocating their facilities for urban renewal as follows:

13–830. *Reimbursement of cost of moving utility facilities.*—Whenever a municipality, housing authority, or other public body of this state determines that the relocation of public service facilities of a utility within a redevelopment or urban renewal project area is necessary to the carrying out of a redevelopment or urban renewal plan pursuant to the provisions of the housing authority law, the municipality, housing authority, or other public body shall reimburse the utility for the cost of relocation of such facilities.

13–831. *Exceptions.*—Sections 13–828—13–831 shall not apply to any taking or damaging of property for which the utility is entitled compensation pursuant to the constitution of Tennessee or the United States or pursuant to any binding agreement inuring to the utility's benefit.

■ On October 31, 1973, plaintiff filed this suit for a declaratory judgment against defendant utilities. The gist of the complaint was that T.C.A. §§ 13–828—13–831 impair the obligations of plaintiff's contracts in violation of Article I, § 10 of the United States Constitution and Article I, § 20, of the Tennessee Constitution. Plaintiff claims that, insofar as the statute attempts to compel plaintiff to bear the burden of the cost of relocating facilities of defendant utilities to make way for the three urban renewal projects discussed above, it unconstitutionally impairs obligations in plaintiff's contracts with HUD, in plaintiff's contracts with Metro, and in Met-

ro's franchise agreements with defendant utilities. Specifically in regard to the franchise agreements, it is plaintiff's contention that they create a contractual obligation on the part of each utility to pay for relocation of its facilities, that plaintiff is a party that can enforce that obligation because it is an agency of Metro, and that this obligation is unconstitutionally impaired by the requirement of §§ 13–828—13–831 that plaintiff pay the relocation costs. With regard to plaintiff's contracts with HUD and its cooperation agreements with Metro, plaintiff also alleges unconstitutional impairment, most notably by the loss of the in-kind credit that would have accrued to the local authorities had NES paid its own relocation costs. Plaintiff asked the court to declare that the statute could not constitutionally require it to reimburse these defendants because of the pre-existing contractual relationships between the parties. In addition to presenting its contract clause arguments, plaintiff also urged that the court hold NES equitably estopped to claim reimbursement under the statute because it had submitted estimates of its relocation costs that were used in planning the urban renewal projects.

Defendants' answers argued in support of the validity of §§ 13–828—13–831 as applied in the instant situation. Several defendants had entered "non-prejudice" agreements with plaintiff prior to this suit, whereby plaintiff agreed to pay their relocation expenses without prejudice to the rights of either party in the event of litigation over the statute's validity. Defendant NES, which had entered such an agreement but apparently had not been paid, included in its answer a counterclaim asking judgment in the amount of past relocation expenses as well as an adjudication of its entitlement to be reimbursed for those incurred in the future.

The case was heard in the Chancery Court of Davidson County on May 17, 1974. It was there brought out that NES had, pursuant to plaintiff's request, furnished plaintiff with estimates of its relocation costs, which plaintiff had relied on and used in its budgets for the projects and in its contracts with HUD. It was estimated that the total cost of relocation for all utilities would be approximately $2,100,000.00. Only the expenses of NES would be eligible for in-kind credit with HUD if each utility bore its own costs because only NES is an agency of Metro government. A multitude of exhibits was introduced, including NES's relocation cost estimates, Metro ordinances approving the urban renewal plans and cooperation agreements executed in accordance with the ordinances, and the franchise agreements of several defendants. The record does not contain copies of the HUD contracts. Stipulations were entered at various times concerning the equipment owned by the several defendants and the cost of relocation in the urban renewal areas.

On January 29, 1975, the Chancellor filed a memorandum opinion in the case. He found that, prior to the statute's enactment, utilities were required to pay their own relocation costs, but that the statute is "a valid enactment of the legislature" which requires plaintiff "to reimburse these utilities for the cost of relocation brought about by the urban renewal plan." The court held that plaintiff was not a party to the franchise agreements between Metro and defendants, and that the statute therefore affected no agreements between the parties. Furthermore, the court, assuming *arguendo* that the franchise agreements required uncompensated relocation of facilities by defendants, found that the legislature could relieve defendants of this obligation without violating the contract clause. The court also rejected plaintiff's contention that NES, due either to its own actions or to those of Metro, is estopped to claim reimbursement for its relocation expenses under the statute. On March 6, 1975, the Chancellor entered a decree dismissing the complaint and sustaining NES's counterclaim for reimbursement from plaintiff in accordance with §§ 13–828—13–831. Each defendant was declared entitled to payment under the statute and provision was made, in case of dispute over the amounts due, for reference to the Clerk and Master. Refer-

ence of the claim of defendant Nashville Gas was made to the Clerk and Master, who found that utility entitled to $83,637.48 in relocation costs from plaintiff. This amount was found already to have been paid by plaintiff under a non-prejudice agreement. The report of the Clerk and Master was affirmed by the Chancellor's decree of December 1, 1976, which also holds plaintiff liable to NES in the total amount of $231,469.63 for relocation costs already billed to plaintiff and declares plaintiff liable for the cost of relocation not yet carried out by NES in the projects. Both NES and Nashville Gas excepted to the Chancellor's failure to allow interest on the amounts awarded to them for the period between the billing date of each expense and the date of judgment. Specific claims for reimbursement by defendants other than NES and Nashville Gas appear not to have been made, and the record contains no mention of the disposition of any such claims below.

The primary question for our consideration is the appeal of plaintiff from the Chancellor's upholding of the statute as it applies to plaintiff in this case. Plaintiff assigns as error the Chancellor's holding that the statute is constitutional as applied to it, his finding that plaintiff is not a party to the franchise agreements between Metro and defendants, and his conclusion that NES is not estopped to rely upon T.C.A. §§ 13–828—13–831. In addition to plaintiff's appeal, defendant NES also appeals to this Court and assigns as error the Chancellor's refusal to allow it interest on its various relocation expenses from the date each was billed.

It is obvious that plaintiff must establish a number of points to succeed in its attack upon the statute under the contract clause, which is the subject of its first and primary assignment of error. In regard to the franchise contracts between Metro and defendant utilities, plaintiff must show that it is a party or that there is some other reason for it to be given standing to attack the alleged impairment of those contracts. The Chancellor found that plaintiff was not a party, and this finding is attacked in plaintiff's second assignment of error. Plaintiff also, of course, must show that the franchise contracts with defendants do require defendants to relocate at their own expense, and there is some doubt about this as well. Further, with regard to all the contracts involved, plaintiff has the burden of establishing an impairment within the meaning of the constitutional provision. These points and others have been briefed and argued to one extent or another, and it is far from clear that their resolution would be in plaintiff's favor. We believe, however, that there is another factor that is clearly dispositive of plaintiff's attack on the statute. Consequently, for purposes of this opinion, we will assume *arguendo* that plaintiff is in the position of a party to all the contracts involved, that the franchise contracts do require relocation of defendants' facilities at defendants' cost, and that there has been some impairment of all the contracts involved. We emphasize that we decide none of these points, and that there is serious doubt about many of them, but that we assume them in order to reach the dispositive issue in the case.

Sections 13–828—13–831 of Tennessee Code Annotated cannot be held to impair the contracts of plaintiff in this case because plaintiff, as an agency created by the State of Tennessee, cannot claim the constitutional protection of the contract clause against the alleged impairment of these contracts by the State. The case we find most nearly in point is *City of Worcester v. Worcester Consolidated Street Railway Co.,* 196 U.S. 539, 25 S.Ct. 327, 49 L.Ed. 591 (1905). In that case a municipality, acting under authority of state law, granted defendant railway company an extension of its lines on condition that the company lay and maintain pavement for a certain area around the track. At the time of this extension, defendant was under a state law obligation to keep its tracks and the street around them in repair, but the state later changed the law so that such maintenance was no longer required. Nevertheless, the city sued to enforce its "contract" with defendant, alleging that the state's change

in the law impaired the obligation of that contract in violation of Article I, § 10 of the United States Constitution. The United States Supreme Court assumed that a valid contract had been created between the city and the company, but held that the state could constitutionally abrogate such a contract as long as the *company* did not object. The Court said:

> A municipal corporation is simply a political subdivision of the state, and exists by virtue of the exercise of the power of the state through its legislative department. The legislature could at any time terminate the existence of the corporation itself, and provide other and different means for the government comprised within the limits of the former city. The city is the creature of the state. 196 U.S. at 548–49, 25 S.Ct. at 329.

Mr. Justice Peckham supported the opinion with citations of and quotes from numerous earlier cases, notable among which are *New Orleans v. New Orleans Waterworks Co.,* 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943 (1891) and *Tippecanoe County v. Lucas,* 93 U.S. 108, 23 L.Ed. 822 (1876), which both involved contract clause problems very similar to that in the instant case. The conclusion of the Court in *Worcester* was that the municipality could not invoke the contract clause to prevent the state, its creator, from impairing a contractual obligation owed the municipality, at least insofar as the contract involved the municipality in a "governmental" rather than in a "proprietary" capacity. Other authorities have subsequently agreed with this conclusion, and it is the prevailing view. See E. Quillin, The Law of Municipal Corporations §§ 4.18 & 19.50 (3d ed. 1969), and cases there cited.

Tennessee law is in accord with the principles stated in the *Worcester* case and the other authority mentioned above. In *Memphis v. Enloe,* 141 Tenn. 618, 214 S.W. 71 (1919) it was recognized that a municipality is merely a creature of the State, and in *Demoval v. Davidson County,* 87 Tenn. 214, 10 S.W. 353 (1889) it was held that the State might by statute release the tax liability of a class of persons to a county, which is merely an "emanation" of the

State and only had the power to impose a tax obligation initially because the State had chosen to bestow it. In *City of Knoxville v. State,* 175 Tenn. 159, 133 S.W.2d 465 (1939), the Court rejected the city's argument that a State statute unconstitutionally impaired the obligations of the city's contract with a teacher, saying "It was competent for the legislature to discharge any obligation created by its agents in favor of the State or its creatures." 133 S.W.2d at 469. Finally, in *State ex rel. Bell v. Cummings,* 130 Tenn. 566, 172 S.W. 290 (1914), the Court held that the legislature could, without violating the contract clause, order funds raised by a county bond issue used for a purpose other than that originally specified. The Court discussed and approved *Worcester,* and said:

> . . . a county as a mere arm of the sovereign power can have, as against the legislative power of the sovereign, no vested rights in the powers conferred upon it for governmental purposes . . . 172 S.W. at 291.

Thus, *Worcester's* holding that a city could not invoke the contract clause to prevent the state from impairing a contractual obligation owed the city acting in its governmental capacity is in harmony with the law of Tennessee. We think that these principles preclude plaintiff MDHA from successfully asserting the contract clause against the State statute in the instant case. Plaintiff is an agency created under authority of State statute. It is also in many ways an agency of the Metro government. It is not, however, in a position any different from that of municipalities, counties, and other state-created entities for purposes of the principles espoused in *Worcester* and the other cases to which we have referred. Further, as appears more fully below, we do not find that the distinction noted in some of those cases between the "governmental" and "proprietary" capacities of such entities applies to allow constitutional protection to plaintiff with respect to any of the contracts involved in the instant case. We hold that neither Article I, § 10 of the United States Constitu-

tion nor Article I, § 20 of the Tennessee Constitution affords plaintiff MDHA, an agency created under State authority and run under municipal auspices, protection from State statutory impairment of its contracts with HUD or with Metro, or of the franchise contracts between Metro and defendant utilities.

Plaintiff insists that it and Metro acted in a "proprietary" capacity in executing some or all of the contracts involved in this case, and that this entitles those contracts to constitutional protection from State impairment at plaintiff's request. There are at least two reasons for rejecting this contention. The first is that the concept that a state-created agency may invoke the contract clause against the State in regard to matters involving the agency on its "proprietary" capacity appears to have been abandoned by the U. S. Supreme Court. In *City of Trenton v. State of New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923), the Court noted that, although previous cases such as *New Orleans, supra,* had referred to a distinction between the right of a municipality to invoke the contract clause against the State that created it in matters involving its governmental capacity and the same right in matters involving its proprietary capacity, the Court had never held that a municipality had that right in any capacity. The Court went on to interpret prior cases as requiring it to hold that a municipality can never assert the contract clause against its sovereign state, and concluded that the case before it presented no substantial federal question. In a 1933 case, *Trenton, Worcester,* and other cases were cited as supporting the following more general proposition:

A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.

*Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933). The general proposition that an agency created under the authority of a state does not have the substantive right to attack a statute of that state on constitutional grounds has since been followed by the Court and by other jurisdictions. See, *e. g., Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); *Jeter v. Ellenville Central School District,* 41 N.Y.2d 283, 392 N.Y.S.2d 403, 360 N.E.2d 1086 (1977). It is obvious that if this principle is adhered to, plaintiff in the instant case cannot assert the contract clause against the State regardless of the capacity in which it acted in the circumstances surrounding the contract it seeks to protect.

The second reason for rejecting plaintiff's argument that the franchise agreements were executed by plaintiff and Metro in a proprietary capacity and so are entitled to constitutional protection against the State at plaintiff's request is simply that plaintiff and Metro were *not* acting in a "proprietary" capacity within the meaning of that word in the present context. In *Tippecanoe County v. Lucas,* 93 U.S. 108, 23 L.Ed. 822 (1876), it was explained that a municipal corporation's governmental capacity, for purposes of deciding whether or not that corporation can invoke constitutional protections against the state that created it, includes the control of property "derived from the state for specific public purposes, or obtained for such purposes through means which the state alone can authorize," such as taxation. 93 U.S. at 114. Constitutional protections were there said to be invocable only with regard to property obtained from other sources and held for special uses. This explanation of the "governmental/proprietary capacity" distinction was adopted in Tennessee in *Cummings, supra,* which contains a long quote from *Tippecanoe.* Nor is *Lewis v. Nashville Gas & Heating Co.,* 162 Tenn. 268, 40 S.W.2d 409 (1931), cited by plaintiff, to the contrary. That case does deal with the franchise agreement of defendant Nashville Gas, and it does use the word "proprietary" in reference to it, but it uses the term to describe the municipality's power to *contract* with the utility in contradistinction to its lack of "governmental" or sovereign authority to *regulate* rates absent a delega-

tion to it of the State's police power. *Lewis* does not involve an attempt by a municipal corporation to assert the contract clause against the State; indeed, the opinion even declares in *dictum* that "the state probably could have suspended" the provision of the franchise agreement in dispute in that case. 40 S.W.2d at 412. It is clear that the "governmental/proprietary capacity" distinction for purposes of municipal invocation of the contract clause against the State, if it has any current validity, is properly set forth in *Tippecanoe* and *Cummings,* supra. Under that view, none of the contracts in issue in the instant case involve plaintiff or Metro in a proprietary capacity, for none involve property obtained by them by means other than those only the State could authorize. Thus, plaintiff can derive no benefit from this distinction.

We emphasize that our holding that T.C.A. §§ 13–828—13–831 do not unconstitutionally impair the obligations of any of the contracts involved in the instant case is based entirely on the circumstance that the challenge is raised by MDHA, a creature of the State and a municipal agency. Anyone not in that position would not be precluded by the principles applied in the instant case from attacking this statute or any other for impairing a contract to which he is a party. Certainly defendant utilities would have the right to attack the statute were it not that the statute "breached" their franchise agreements by releasing an obligation owed by them to the government, rather than vice versa. Similarly HUD, as a party to contracts with plaintiff, would have the right to sue the State if those contracts were impaired to HUD's detriment by §§ 13–828—13–831. This is so despite the fact that, should such a suit be brought against the State by a party not its creature, it seems likely that §§ 13–828—13–831 would be upheld on the merits against contract clause arguments as an exercise of police power that the State cannot contract away. See *City of Chattanooga v. Southern Ry. Co.,* 128 Tenn. 399, 161 S.W. 1000 (1913). An important factor in such a suit would be that our State Supreme Court has held a similar statute to be a proper exer-

cise of the police power in *Pack v. Southern Bell,* 215 Tenn. 503, 387 S.W.2d 789 (1965), though this would not be controlling because *Pack* did not involve the contract clause. In any event, we point out that such a contract clause challenge to the statute by a third party not created by the State is not the instant case, which concerns only a constitutional attack on a State statute by a state-created agency.

■ We now turn to plaintiff's argument of estoppel against NES. Basically, this argument rests on the circumstance of NES's having supplied plaintiff with cost estimates for relocation of its facilities and of their having been relied upon by plaintiff and Metro in making up budgets and entering the contracts involved in these urban renewal projects. In particular, plaintiff claims that these estimates were relied on in computing the amount of Metro's in-kind credit toward its ⅓ share of the projects' cost. Plaintiff, quoting Pomeroy's definition of equitable estoppel as found in *Church of Christ v. McDonald,* 180 Tenn. 86, 171 S.W.2d 817, 821 (1943), argues that these actions of NES and Metro estop NES to claim reimbursement for its relocation expenses under T.C.A. §§ 13–828—13–831. The Chancellor's ruling on this contention was that "[t]he Court can find no basis on which to hold that the Electric Power Board [NES] is estopped from claiming the benefits of the statute in question." We agree. While equitable estoppel as expounded in *McDonald* does not require fraudulent intent, it does require at least some voluntary action, such as intentional or negligent concealment of facts, which leads the other party to rely to his detriment by changing his position for the worse. Further, like all equitable doctrines, equitable estoppel is to be used to achieve fairness in dealings between parties. As we view the record, the evidence does not preponderate against the Chancellor's finding that the facts do not establish the requisite elements of an equitable estoppel against NES. In addition, we note that it would indeed be odd if NES were held estopped to accept the benefits of a statute

because its truthful representations were relied on by plaintiff in entering into contracts, when we have already held that any impairment of the contracts themselves by that statute is entirely valid and constitutional as far as plaintiff is concerned. This assignment of error is overruled.

Finally, we consider the assignment of error raised by defendant NES. The action complained of is the Chancellor's disallowance of interest from the date of billing of the relocation expenses of NES, the only defendant to have affirmatively raised its claim for reimbursement and to have remained unpaid. NES does not claim that it is entitled to interest over that period as a matter of right, but admits that such an allowance in this case is within the discretion of the trial court under *Farmers Chemical Association, Inc. v. Maryland Casualty Co.*, 421 F.2d 319, 323 (6th Cir. 1970) (Tennessee law) and cases cited therein. NES contends that the Chancellor unreasonably exercised his discretion in failing to grant the requested interest and that it is only fair that this request be granted. We have considered NES's arguments on this point, but can find no abuse of discretion in the Chancellor's action. This assignment of error is accordingly overruled. NES's rights to interest from the date of judgment in accordance with T.C.A. § 47–14–110, of course, are unaffected by this holding.

Affirmed.

DAUGHTREY, Special Judge, and TODD, J., concur.